James E. Cecchi
Donald A. Ecklund
Kevin G. Cooper
**CARELLA BYRNE CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Email: jcecchi@carellabyrne.com

Robert V. Prongay
Leanne H. Solish
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Plaintiffs*

*Liaison Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re KENVUE INC. SECURITIES LITIGATION <br><br> This Document Relates To:  ALL CASES | Case No.: 3:23-cv-20998-ZNQ-JBD |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF FACTS ....................................................................3

      A.    Kenvue: The "Pure-Play" Consumer Health Giant..............................3

      B.    Phenylephrine: A Commonly Used Nasal Decongestant ....................4

      C.    The NDAC Meets And Finds Oral PE Is Ineffective............................5

III.  LEGAL STANDARDS .........................................................................6

IV.   THE CAC PLEADS ACTIONABLE STATEMENTS AND OMISSIONS UNDER SECTIONS 11 AND 12(a)(2) OF THE SECURITIES ACT...........7

      A.    The Challenged Statements Were Materially Misleading ...................8

            1.    The Tylenol Studies Statement Was Materially Misleading ......9

            2.    The Risk Factor Statement Was Materially Misleading...........14

            3.    The OTC Monograph Statement Was Materially Misleading..19

      B.    Defendants Failed To Make Required Disclosures Under Item 105 ..20

      C.    Plaintiffs' Claims Are Quantitatively Materiality..............................23

      D.    The Public Availability Of The Omitted Information Does Not Undercut The Materiality Of The Challenged Statements.................................26

            1.    Third Circuit Law Bars Defendants' Argument ........................26

            2.    The Out-Of-Circuit Cases Relied On By Defendants Do Not Rescue Their Argument ...........................................................31

      E.    Defendants' Claim Of Undue Disclosure Burdens Is Unsupported ...36

V.    THE CAC ADEQUATELY ALLEGES STANDING..................................38

      A.    The CAC Adequately Alleges Section 11 Standing .........................38

B.      The CAC Adequately Alleges Section 12(a)(2) Claims ......................41

VI.    THE CAC ALLEGES CONTROL PERSON LIABILITY .........................44

VII.   CONCLUSION ...............................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Alta Partners, LLC v. Forge Glob. Holdings, Inc.*,
  2024 WL 1116682 (S.D.N.Y. Mar. 13, 2024) ........................................................40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................................6

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................... 27, 28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................................6

*Briarwood Invs. Inc. v. Care Inv. Tr. Inc.*,
  2009 WL 536517 (S.D.N.Y. Mar. 4, 2009) ............................................................43

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) ....................................................................35

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010) ........................................................................30

*Dolphin and Bradbury, Inc. v. SEC*,
  512 F.3d 634 (D.C. Cir. 2008) .................................................................................36

*Dutton v. Harris Stratex Networks, Inc.*,
  270 F.R.D. 171 (D. Del. 2010) .......................................................................... 44, 45

*Endo v. Albertine*,
  812 F. Supp. 1479 (N.D. Ill. 1993) .........................................................................35

*Flynn v. Sientra, Inc.*,
  2016 WL 3360676 (C.D. Cal. June 9, 2016) ..................................................... 15, 17

*Gaer v. Educ. Mgmt. Corp.*,
  2011 WL 7277447 (W.D. Pa. Aug. 30, 2011) .........................................................30

*Garnett v. RLX Tech. Inc.*,
 632 F. Supp. 3d 574 (S.D.N.Y. 2022) ........................................................................34

*Haping v. 17 Educ. & Tech. Grp. Inc.*,
 2023 WL 8716895 (S.D.N.Y. July 20, 2023).............................................................34

*Huang v. Avalanche Biotech. Inc.*,
 2016 WL 6524401 (N.D. Cal. Nov. 3, 2016) .............................................................13

*In re Adams Golf, Inc. Sec. Litig.*,
 176 F. Supp. 2d 216 (D. Del. 2001)...........................................................................23

*In re Adams Golf, Inc. Sec. Litig.*,
 381 F.3d 267 (3d Cir. 2004)................................................................................ passim

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
 2007 WL 81937 (E.D. Pa. Jan. 9, 2007)............................................................. 42, 44

*In re Ariad Pharms., Inc. Sec. Litig.*,
 842 F.3d 744 (1st Cir. 2016).....................................................................................40

*In re Burlington Coat Factory Sec. Litig.*,
 114 F.3d 1410 (3d Cir. 1997).....................................................................................28

*In re Century Aluminum Co. Sec. Litig.*,
 729 F.3d 1104 (9th Cir. 2013) ...................................................................................40

*In re Craftmatic Sec. Litig.*,
 890 F.2d 628 (3d Cir. 1989).......................................................................................42

*In re Donald J. Trump Casino Sec. Litig.*,
 7 F.3d 357 (3d Cir. 1993).................................................................................... 26, 27

*In re Fisker Auto. Holdings, Inc. S'holder Litig.*,
 2015 WL 6039690 (D. Del. Oct. 15, 2015) ........................................................ 43, 44

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
 352 F. Supp. 2d 429 (S.D.N.Y. 2005) .......................................................................43

iv

*In re IPO Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) ............................................................ 30, 31

*In re Measurement Specialties, Inc.*,
2003 WL 27398420 (D.N.J. Sept. 29, 2003) ......................................42

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005) ...............................................................28

*In re Merrill Lynch & Co., Inc. Rsch. Reports Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) .................................................34

*In re MetLife Demutualization Litig.*,
156 F. Supp. 2d 254 (E.D.N.Y. 2001) .................................................36

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ...............................................................7

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2002) ..............................................................28

*In re NIO, Inc. Sec. Litig.*,
2023 WL 5048615 n.15 (E.D.N.Y. Aug. 8, 2023) ..............................30

*In re Oral Phenylephrine Marketing and Sales Practices Litig.*,
MDL No. 389, --- F. Supp. 3d ----, 2023 WL 8538831
(E.D.N.Y. Dec. 6, 2023) .....................................................................25

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 n.6 (S.D.N.Y. Aug. 11, 2021) ..............................40

*In re Philip Morris Int'l Inc. Sec. Litig.*,
2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021) ...................................13

*In re RAIT Fin. Tr. Sec. Litig.*,
2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ................................. 43, 44

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .............................................................13

v

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)................................................................. 7, 38, 39, 44

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996)................................................................42

*Jaroslawicz v. M&T Bank Corp.*,
   962 F.3d 701 (3d Cir. 2020)................................................................ 21, 22, 23

*Johnson v. Pozen Inc.*,
   2009 WL 426235 (M.D.N.C. Feb. 19, 2009)................................................................32

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004) ................................................................33

*Klein v. Gen. Nutrition Cos., Inc.*,
   186 F.3d 338 (3d Cir. 1999)................................................................ 26, 27

*Lau v. Opera Ltd.*,
   527 F. Supp. 3d 537 (S.D.N.Y. 2021) ................................................................32

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)................................................................32

*Lord Abbett Mun. Income Fund, Inc. v. Citigroup Glob. Markets, Inc.*,
   2012 WL 13034154 (D.N.J. July 12, 2012)................................................................31

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
   601 U.S. 257 (2024)................................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)................................................................15

*McMahon & Co. v. Wherehouse Entm't, Inc.*,
   900 F.2d 576 (2d Cir. 1990)................................................................8

*Merritt v. Molecular Partners AG*,
   2024 WL 495140 (S.D.N.Y. Feb. 5, 2024)................................................................33

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)..................................................................................19

*Miller v. Thane Intern., Inc.*,
519 F.3d 879 (9th Cir. 2008) ...............................................................................32

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)..................................................................................33

*Obasi Inv. LTD v. Tibet Pharms., Inc.*,
931 F.3d 179 (3d Cir. 2019)....................................................................................7

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)............................................................................... 7, 8, 11, 12

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)..................................................................................28

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012)....................................................................................7

*Phillips v. Cty of Allegheny*,
515 F.3d 224 (3d Cir. 2008)....................................................................................6

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) ..............................................................................32

*Sailors v. N. States Power Co.*,
4 F.3d 610 (8th Cir. 1993) ............................................................................. 32, 35

*Salvani v. ADVFN PLC*,
50 F. Supp. 3d 459 (S.D.N.Y. 2014) .....................................................................30

*Schaeffer v. Nabriva Therapeutics plc*,
2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020) ................................................ 16, 17

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ................................................................................11

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC,*
  351 F. Supp. 3d 874 (E.D. Pa. 2018) ....................................................................44

*Seibert v. Sperry Rand Corp.,*
  586 F.2d 949 (2d Cir. 1978) .................................................................................34

*Shapiro v. UJB Fin. Corp.,*
  964 F.2d 272 (3d Cir. 1992) ........................................................................... 38, 39

*Silverstrand Invs. v. AMAG Pharms., Inc.,*
  707 F.3d 95 (1st Cir. 2013) ...................................................................................21

*Siracusano v. Matrixx Initiatives, Inc.,*
  585 F.3d 1167 (9th Cir. 2009) ..............................................................................15

*Slack Technologies, LLC v. Pirani,*
  598 U.S. 759 (2023) ........................................................................................ 39, 40

*Weiner v. Quaker Oats Co.,*
  129 F.3d 310 (3d Cir. 1997) ...................................................................................8

*Wielgos v. Commonwealth Edison Co.,*
  892 F.2d 509 (7th Cir. 1989) ................................................................................33

## STATUTES

15 U.S.C. § 77k(a) .................................................................................... 7, 21
15 U.S.C. § 77*l*(a)(2) .......................................................................................7

## RULES

Fed. R. Civ. P. 15(a)(2) ...................................................................................45

## REGULATIONS

17 C.F.R. § 229.105(a) ....................................................................................20

| Glossary of Defined Terms | |
| --- | --- |
| **Term** | **Definition** |
| CAC or Complaint | Plaintiffs' Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 38) |
| CHPA | Consumer Healthcare Products Association |
| Company | Defendant Kenvue Inc. |
| Defendants | Kenvue, J&J, the Individual Defendants, and the Underwriter Defendants |
| Defs. Ex. | Exhibits attached to the Certification of David R. Kott in support of Defendants' Motion to Dismiss the Consolidated Amended Complaint |
| Director Defendants | Larry Merlo, Richard E. Allison, Jr., Peter M. Fasolo, Tamara S. Franklin, Seemantini Godbole, Melanie L. Healey, Betsy D. Holden, Vasant Prabhu, Michael E. Sneed, and Joseph J. Wolk |
| Exchange Act | The Securities and Exchange Act of 1934 |
| Exchange Offer | J&J's offer to J&J shareholders to exchange J&J common stock for shares of Kenvue common stock at a discount, as announced on July 24, 2023 and which expired on August 18, 2023 |
| Exchange Offer Prospectus | Kenvue's final prospectus for the Exchange Offer dated August 14, 2023 and filed with the SEC on Form 424B3 |
| Exchange Offer Registration Statement | Kenvue's Exchange Offer Prospectus and the registration statement filed on July 24, 2023 with the SEC on Form S-4 along with an amendment filed with the SEC on Form S-4/A on August 3, 2023 and declared effective by the SEC on August 14, 2023 |
| FDA | The United States Food and Drug Administration |
| GRASE | Generally Recognized as Safe and Effective |
| Individual Defendants | The Officer Defendants and the Director Defendants |
| IPO | Kenvue's initial public offering which closed on May 8, 2023 |
| IPO Prospectus | Kenvue's final prospectus for the IPO dated May 3, 2023 and filed with the SEC on Form 424B4 on May 4, 2023 |
| IPO Registration Statement | Kenvue's IPO Prospectus and the registration statement filed on January 4, 2023 with the SEC on Form S-1 along with multiple amendments filed with the SEC on Form S-1/A, the last of which was filed with the SEC on May 1, 2023 |
| J&J | Defendant Johnson & Johnson |
| J&J Consumer | Johnson & Johnson Consumer Inc. |
| Kenvue | Defendant Kenvue Inc. |
| Lead Plaintiff | Joseph Ditta |

| MTD | Defendants' Brief in Support of Their Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint, served on May 13, 2024 |
|---|---|
| NDAC | The FDA's Nonprescription Drugs Advisory Committee |
| Officer Defendants | Thibaut Mongon, Paul Ruh, and Heather Howlett |
| OTC | Over-the-counter |
| PE | Phenylephrine |
| Plaintiffs | Lead Plaintiff together with David Gruthoff |
| Pls. Ex. | Exhibits attached to the Declaration of James E. Cecchi in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint |
| SEC | The United States Securities and Exchange Commission |
| Securities Act | The Securities Act of 1933 |
| Underwriter Defendants | Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, BofA Securities, Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., RBC Capital Markets, LLC, BNP Paribas Securities Corp., UBS Securities LLC, BBVA Securities Inc., ING Financial Markets LLC, Intesa Sanpaolo S.p.A, Santander US Capital Markets LLC, UniCredit US Capital Markets LLC, Academy Securities, Inc., Independence Point Securities LLC, Samuel A. Ramirez & Company, Inc., R. Seelaus & Co., LLC, and Siebert Williams Shank & Co., LLC |

x

## I.    INTRODUCTION

Kenvue is the former consumer health segment of pharmaceutical giant Johnson & Johnson ("J&J"), which spun off from J&J to become an independent company in 2023.[1] About two months before Kenvue's IPO, a significant regulatory event occurred: the FDA scheduled a meeting before its Nonprescription Drugs Advisory Committee ("NDAC") to reconsider the efficacy of oral phenylephrine ("PE") as a nasal decongestant. PE was an active ingredient in multiple products sold by Kenvue under its Tylenol, Sudafed, and Benadryl brands.

The scheduling of the NDAC meeting received virtually no attention from the press, but it presented a material risk to Kenvue because it threatened oral PE's status as "Generally Recognized as Safe and Effective" (GRASE). Over the previous years, mounting medical evidence indicated that oral PE was not effective as a nasal decongestant, and the NDAC meeting provided a vehicle for regulators to address a citizen petition seeking to have the FDA reclassify oral PE as not GRASE. That petition had been filed in 2015 and remained dormant for years, but it was updated with new medical evidence in 2022 and then endorsed by two prominent organizations representing pharmacists and schools of pharmacy, who sought to have oral PE removed from the over-the-counter market.

---

[1] Capitalized terms are defined in the Glossary. Unless indicated, all emphasis has been added and citations are cleaned up. Citations to "¶__" refer to the CAC, and citations to "MTD __" refer to Defendants' brief.

The offering materials for Kenvue's IPO made no mention of the NDAC proceedings or the underlying dispute about the effectiveness of PE. The offering materials also made several statements about the safety of Kenvue's products and the regulatory risks facing Kenvue that were misleading in light of those omissions.

A few months after the IPO, Defendants engaged in a second securities offering, in which shareholders of J&J were given an opportunity to exchange their J&J shares for Kenvue shares. The offering materials for this transaction repeated the same misleading statements that were made in the IPO offering materials.

Following these offerings, the NDAC held its meeting and voted unanimously that the scientific data does not support a finding that oral PE is effective as a nasal decongestant. Kenvue's stock price fell precipitously on this news.

Defendants argue that they are not liable because they did not "conceal[]" any information from investors, they did not act in bad faith, and the omitted information was publicly available. But this is not a fraud case. Plaintiffs only assert claims under §§ 11, 12(a)(2), and 15 of the Securities Act. These statutes create near-strict liability for misleading statements or omissions in registration statements and prospectuses. They do require any concealment, bad faith, or scienter.

In addition, because this is not a fraud-on-the-market case, Plaintiffs are not required to allege, and have not alleged, the existence of an efficient market. Thus, information that is publicly available, but not widely disseminated, is not imputed to

2

Plaintiffs. The only question is whether the offering materials made misleading statements or failed to make required disclosures. Under well-settled Third Circuit pleading standards, the Complaint more than adequately alleges actionable misrepresentations and omissions. Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Kenvue: The "Pure-Play" Consumer Health Giant

Kenvue describes itself as "the world's largest pure-play consumer health company." ¶3. Before its IPO in May 2023, Kenvue served as the consumer health segment of J&J. Kenvue is known for its iconic household brands such as Tylenol, Sudafed, Benadryl, Listerine, Johnson's, Band-Aid, Zyrtec, and Nicorette. ¶¶3, 69.

In November 2021, J&J announced its intention to spin off its consumer health segment as a new publicly traded company. ¶65. After an extended process (¶¶65-71), Kenvue closed its IPO on May 8, 2023, selling 198,734,444 shares of common stock at $22 per share and raising net proceeds of $4.2 billion. ¶¶73-74.

After the IPO, J&J continued to control Kenvue, owning about 90% of Kenvue's outstanding common stock. ¶¶5, 73. On July 24, 2023, Kenvue and J&J announced an exchange offer under which J&J shareholders could exchange J&J stock for Kenvue stock owned by J&J at a discount. ¶5. Following the August 18, 2023 expiration of the Exchange Offer, J&J exchanged ~1.5 billion shares of Kenvue common stock, roughly 80% of Kenvue's outstanding common stock. ¶¶5, 75-79.

3

**B.      Phenylephrine: A Commonly Used Nasal Decongestant**

Since 2006, phenylephrine ("PE") has been the main ingredient used in over-the-counter ("OTC") oral nasal decongestants in the United States, following restrictions enacted on the sale of products containing pseudoephedrine. ¶¶7, 84, 85. In 2022, estimates of retail sales for OTC products containing oral PE were approximately $1.763 billion. ¶85. Kenvue markets and sells numerous oral PE products under its Sudafed, Benadryl, and Tylenol brands. ¶¶7, 85.

In December 2007, the FDA's NDAC met to discuss the safety and effectiveness of oral PE as an OTC nasal decongestant, following efficacy concerns raised by three professors in a citizen petition. ¶¶8, 87. The NDAC concluded that the available data was suggestive of efficacy. Still, it also concluded that additional clinical data was needed to make a final determination, and it "asked for new data on the absorption and efficacy of oral phenylephrine obtained using more modern standards." ¶87.

In November 2015, two of the same professors submitted a second citizen petition to the FDA, citing four studies/trials reported after the 2007 NDAC meeting that, according to the professors, "demonstrate that PE is no more effective than placebo in decreasing nasal congestions." ¶¶9, 88.

The 2015 petition remained dormant until 2022, when petitioners submitted a supplement citing additional studies in support of their contention that oral PE was ineffective as a nasal decongestant. ¶90. Two of these studies were sponsored by J&J.

*Id.* Soon after, two prominent associations representing pharmacists and schools of pharmacy submitted comments in support of the petition. ¶¶91-92.

### C.    The NDAC Meets And Finds Oral PE Is Ineffective

In early March 2023, the FDA announced that an NDAC meeting would take place on April 12, 2023 to "discuss the adequacy of efficacy data available for oral phenylephrine as a nasal decongestant and whether oral nasal decongestants phenylephrine hydrochloride and phenylephrine bitartrate should be reclassified as not 'Generally Recognized as Safe and Effective' (GRASE) due to lack of efficacy." ¶93. On March 21, 2023, the FDA postponed the meeting to an undetermined date. ¶94. On July 12, 2023, the FDA announced that the NDAC meeting to discuss the efficacy of oral PE would be held on September 11 and 12, 2023. ¶96.

On September 11 and 12, 2023, the NDAC held its meeting to reconsider the efficacy of oral PE. Briefing documents from the FDA and the Phenylephrine Task Group of the Consumer Healthcare Products Association ("CHPA") were submitted in advance of the meeting. ¶¶99-100. The CHPA is a national trade association representing manufacturers and marketers of OTC medications, whose members previously included J&J and now include Kenvue. ¶¶89, 95. The CHPA's Task Group disagreed with the petitioners' claims that the new studies showed a lack of efficacy. ¶99. The FDA, for its part, stated that since 2007 it had continued to reevaluate the scientific support for the use of PE and had "now come to the initial conclusion that

orally administered PE is not effective as a nasal decongestant." ¶¶100-06. Multiple industry representatives, FDA participants, and members of the public made presentations at the meeting. ¶¶99-106; MTD 9. At the end of the two-day meeting, the NDAC voted unanimously that the current scientific data does not support a finding that oral PE is effective as a nasal decongestant. ¶13.

On this news, Kenvue's share price fell by $1.01 per share, or 4.58%, to close at $21.06 on September 12, 2021, from a prior closing price of $22.07 on September 11, 2023.[2] Since September 12, 2023, Kenvue's shares have not closed above the $22.00 IPO price. ¶¶15, 114.

## III.   LEGAL STANDARDS

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[2] The Complaint contains a typographical error misidentifying the September 11 and 12, 2023 dates as September 11 and 12, 2021. ¶¶15, 114. If the Court denies Defendants' motion, Plaintiffs will file a corrected complaint fixing this error. If the Court grants the motion, Plaintiffs will correct the error in any amended complaint.

(2007)).

## IV. THE CAC PLEADS ACTIONABLE STATEMENTS AND OMISSIONS UNDER SECTIONS 11 AND 12(a)(2) OF THE SECURITIES ACT

Section 11 of the Securities Act creates a private right of action for purchasers of securities if a registration statement "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). "Section 11 imposes **near-strict liability** for untruths and omissions made in a registration statement." *Obasi Inv. LTD v. Tibet Pharms., Inc.*, 931 F.3d 179, 182 (3d Cir. 2019). "Section 12(a)(2) imposes liability under similar circumstances for misstatements or omissions in a prospectus." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (citing 15 U.S.C. § 77*l*(a)(2)).

"[U]nlike securities fraud claims pursuant to section 10(b) of the [Exchange Act], plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). Where, as here, "a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006).

An omitted fact is material where "there is a substantial likelihood that a reasonable investor would consider it important." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 196 (2015). "Materiality is

ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004).[3] "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Adams Golf*, 381 F.3d at 275 (emphasis in original).

The same fact-intensive inquiry governs the analysis of whether a statement is misleading. *Id.* at 277-78. A statement that is "technically true" may nonetheless mislead if it omits material information, thereby giving a misleading impression about the issuer's business. *Id.* at 278.[4] Dismissal is not appropriate if "[r]easonable minds could disagree" on whether the omission rendered the challenged statement misleading in context. *Adams Golf*, 381 F.3d at 278.

## A.     The Challenged Statements Were Materially Misleading

The CAC challenges three statements that were made in the IPO Registration Statement and Prospectus and repeated in the Exchange Offer Registration Statement and Prospectus. These consisted of (a) a statement about the effectiveness of Tylenol products in relieving certain symptoms ("Tylenol Studies Statement"), (b) a risk factor

---

[3] *Accord Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) (fact-specific emphasis of materiality inquiry "militates against a dismissal on the pleadings").

[4] *See also Omnicare*, 575 U.S. at 192 ("literal accuracy is not enough"); *McMahon & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("Some statements, although literally accurate, can . . . mislead investors.").

disclosure concerning potential risks arising from concerns about the reliability, safety, or efficacy of Kenvue's products ("Risk Factor Statement"), and (c) a statement about recent reforms to the OTC monograph system ("OTC Monograph Statement"). Each of these statements was materially misleading, particularly when considered in light of the other statements.

### 1. The Tylenol Studies Statement Was Materially Misleading

The first challenged statement was the Tylenol Studies Statement:

> Tylenol is the #1 global Pain brand and the #2 global Self Care brand, with the #1 U.S. household penetration. . . . Although the Tylenol story started with just one product, it has evolved to include a ***full suite*** of . . . products. ***Studies sponsored by Johnson & Johnson Consumer Inc. and by third parties have shown that these products help relieve, among other things***, . . . ***sinus and nasal congestion*** . . . .

¶¶128, 138.

This statement was materially misleading because it failed to disclose, *inter alia*, that between 2007 and 2023, multiple well-designed studies and clinical trials, including studies sponsored by J&J and studies sponsored by third parties, demonstrated that oral PE was not effective at the monographed dosages, and that multiple Tylenol products containing PE were therefore not effective at relieving sinus and nasal congestion. ¶¶129, 139.

Defendants argue that the Tylenol Studies Statement was not misleading for several reasons. Each of these arguments fails. First, Defendants argue that the Tylenol Studies Statement did not refer specifically to PE and that no reasonable investor would

9

interpret the statement "as falsely reassuring them about the risk of regulatory action regarding the efficacy of a single ingredient, PE." MTD 19. The statement, however, referred to the "full suite" of Tylenol products (¶128), and a reasonable investor would read the statement as a representation that studies demonstrated the effectiveness of **all** the active ingredients in those products. The "full suite" of Tylenol products included Tylenol Sinus + Headache, Tylenol Sinus Severe, and Tylenol Cold + Flu, in which PE was the only active ingredient used to treat nasal congestion. ¶¶7, 85, 100. It makes zero sense for the Tylenol Studies Statement to be construed as somehow excluding PE.[5]

Second, Defendants argue that their statement was literally true, because certain studies did show oral PE was effective, and the CAC alleges only that "other studies show that the ingredient PE is not effective at relieving congestion." MTD 19 (emphasis removed). But literal accuracy is not the measure of whether a statement is misleading. *See* note 4, *supra*. Even if Defendants' statement intended to refer to certain studies and not others, the statement did not specify which studies it relied on and made a broad claim about the effectiveness of Tylenol products. The Tylenol Studies Statement also must be read in conjunction with the Risk Factor Statement, which states "we believe our products are reliable, safe and effective when used for their intended purposes in

---

[5] Defendants argue that Plaintiffs ignore Tylenol products with pseudoephedrine and "do not contest that pseudoephedrine is effective." MTD 19 n.12. This is irrelevant. That Defendants did not misrepresent the effectiveness of pseudoephedrine does not diminish the fact that they did misrepresent the effectiveness of PE.

10

accordance with label directions." ¶¶126, 136. Together, these statements can be fairly read to represent both that (1) Defendants believed that oral PE was effective at relieving congestion, and (2) the available scientific evidence, including third party studies, supported that belief.

These representations were materially misleading. "[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, *including disclosing adverse information that cuts against the positive information*." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Thus, even if Defendants intended to refer to different studies, their choice to tout third party studies as evidence of the effectiveness of Tylenol products containing PE obligated Defendants to disclose the existence of other more recent studies demonstrating the opposite.

Indeed, even an opinion statement may be actionable if the issuer fails to disclose material facts "going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. A reasonable investor expects not only that an issuer believes its stated opinion but that the opinion "fairly aligns with the information in the issuer's possession at the time." *Id.* at 189. Defendants' opinion that oral PE was effective at relieving congestion, even if sincerely held, did not "fairly align[]" with the facts in Defendants' possession. Those facts included multiple well-

11

designed studies, sponsored by Johnson and Johnson and third parties, showing that oral PE was ineffective at the monographed dosages, and that at least two prominent associations representing pharmacists and schools of pharmacy agreed that these studies showed that oral PE was ineffective. These contrary studies were not minor facts "cutting the other way," *id.*, but material facts undermining the foundation of Defendants' supposed belief. It was misleading for Defendants to tout studies supporting their claims of efficacy without disclosing the existence of these other studies and the pendency of regulatory proceedings seeking to reclassify oral PE as not GRASE due to lack of efficacy.

Defendants next argue that the Tylenol Studies Statement was not misleading in context because Kenvue was only providing "a high-level overview" of its "world-class portfolio of iconic, trusted brands" with brief highlights of "22 different key brands." MTD 20. But of those key brands, Defendants only stated for a narrow subset that their effectiveness was shown by "[s]tudies" and, for an even narrower subset (only Tylenol and Listerine), that their effectiveness was shown by studies or clinical trials *sponsored by third parties*.[6] Thus, Kenvue's claims about the Tylenol brand and its "full suite" of

---

[6] *Compare* ¶128 ("***Studies sponsored by [J&J Consumer] and by third parties*** have shown that these [Tylenol] products help relieve … sinus and nasal congestion.") *and* Defs. Ex. C at 139 (Listerine: "The safety and efficacy of Listerine's fixed combination of four essential oil formulation has been demonstrated ***in clinical trials sponsored by [J&J Consumer] and third parties***.") *with* Defs. Ex. C at 139 ("Johnson's [baby toiletries] provides safe and gentle formulas that have been shown in ***studies sponsored***

products stood out from Kenvue's claims about its other products. ¶128. Kenvue emphasized that its efficacy claims about its Tylenol products were based on independent, third-party studies, not just research by J&J, and thereby intimated that investors and consumers could rely on those claims as scientifically founded.

Finally, Defendants argue that claims like those raised by Plaintiffs are regularly dismissed because "companies do not have to comprehensively canvas the scientific literature any time they talk about a positive scientific study." MTD 20. But the cases relied on Defendants are inapposite and involve facts very different from those here. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 (9th Cir. 2012) (failure to disclose less severe side effects not misleading where press release stated it was only reporting incidents of moderate severity or greater); *In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *11 (S.D.N.Y. Sept. 10, 2021) ("Plaintiffs have failed to plausibly allege that Defendants' factually accurate statements about their clinical trials were rendered misleading by virtue of the failure to disclose results from a ***different category*** of studies."); *Huang v. Avalanche Biotech. Inc.*, 2016 WL 6524401, at *6-7 (N.D. Cal. Nov. 3, 2016) (failure to report interim data not misleading where plaintiffs admitted they did not know what the data showed and "invite[d] the Court to speculate"

---

***by [J&J Consumer]*** to improve hygiene, skin health and sensory experience.") and *id.* (Band-Aid: "Our brand is further supported by years of research, based on ***studies sponsored by Johnson & Johnson*** … that demonstrates that a covered wound heals faster than an uncovered wound."); *see also* Defs. Ex. C at 134-40 (summary of other key brands).

13

about what was contained in the data).

None of those circumstances are present here. Defendants did not define which studies were covered by their statement and which studies were not covered. Nor do Defendants argue that the omitted studies were of a "different category" than the ones they disclosed, other than the fact that the results of the omitted studies were not favorable for Defendants. Plaintiffs are not speculating about the contents of the omitted studies. Instead, this is simply a case where Defendants touted the older studies that they found favorable and ignored the more recent and robust studies showing that PE was not effective. This was misleading.

### 2.    The Risk Factor Statement Was Materially Misleading

The second challenged statement was the Risk Factor Statement:

> ***Concerns about the reliability, safety or efficacy of our products or their ingredients***, whether raised internally or by litigants, ***regulators***, consumer advocacy groups, third-party interest groups ***or others***, and whether or not based on scientific or factual evidence, ***have resulted, and could in the future result, in governmental investigations, regulatory action*** (including the shutdown of manufacturing facilities), private claims and lawsuits, significant remediation and related costs, safety alerts, product shortages, declining sales or reputational damage (including damage to brand image, brand equity and consumer trust in our products).

¶¶126, 136 (emphasis altered).

This statement was materially misleading, because it failed to disclose that there were already pending regulatory proceedings presenting a material threat to the GRASE status of oral PE. Specifically, the FDA had scheduled a meeting of the NDAC to "discuss the adequacy of efficacy data available for oral phenylephrine as a nasal

decongestant and whether oral nasal decongestants phenylephrine hydrochloride and phenylephrine bitartrate should be reclassified as not 'Generally Recognized as Safe and Effective' (GRASE) due to lack of efficacy." ¶93. This initiation of proceedings threatening the GRASE status of the key ingredient in a key set of Kenvue's products was a "regulatory action" that raised a material risk of further regulatory action, including the reclassification of oral PE as not GRASE.

Courts have found risk disclosures misleading under similar circumstances where companies warned of the possibility of future regulatory proceedings or litigation, but failed to disclose that such proceedings or litigation had already begun. *See, e.g.*, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (risk disclosure was plausibly misleading because "it spoke of the risk of product liability actions against the company without revealing that a lawsuit already had been filed"), *aff'd*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *11-*12 (C.D. Cal. June 9, 2016) (warning that products "may not be manufactured . . . in compliance with regulatory requirements" was plausibly misleading when issuer's manufacturer "had been found by a number of agencies to have violated such rules").

Defendants argue that the NDAC is only an advisory body, that its recommendations are not binding, and that even now, about 10 months after it voted that oral PE was not effective, the FDA still has not reclassified oral PE as not GRASE.

15

MTD 2, 4.[7] But the initiation of an NDAC meeting by the FDA for the NDAC to make recommendations on whether oral PE should be reclassified was itself a "regulatory action" within the meaning of the Risk Factor Statement. Just as the failure to disclose a pending lawsuit may render a risk disclosure misleading even before the lawsuit has resulted in any determination of liability, the failure to disclose the initiation of a regulatory proceeding may render a risk disclosure misleading even before there is any further agency action or rule.

*Schaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020) is instructive. In *Schaeffer*, a company's risk disclosure warned that the company's failure to comply with regulatory requirements might lead to "warning or untitled letters." *Id.* at \*4. The court found this risk disclosure misleading because the company had already received an FDA Form 483, which was "technically not the same as a warning or untitled letter," but the court nonetheless held that "its contents might be serious enough that a reasonable investor would consider it a substantially equivalent FDA warning." *Id.* at \*11. Here, the scheduling of the NDAC meeting ***technically was***

---

[7] That the FDA has not yet acted on the NDAC's recommendation is no surprise. According to Harvard Medical School professor Aaron Kesselheim, the "FDA follows the advice of its advisory committees about 80 percent of the time," but the process can take years. *See* Pls. Ex. 1. "***Months would be shockingly fast***. ***When the FDA took steps to remove ephedrine from OTC dietary supplements*** — a product that was legitimately dangerous — ***it took years to take it through the administrative process***. If the FDA declares that it favors removing the drug from the market, and manufacturers do not voluntarily comply such that FDA has to go through the full rule-making process, ***it could actually take quite a long time***." *Id.*

16

a "regulatory action" (¶126) and while additional regulatory actions may have been necessary before any change in the rules were to occur, the meeting itself was "serious enough" to require disclosure so that the Risk Factor Statement would not be misleading. *Schaeffer*, 2020 WL 7701463, at *11.

This is particularly true considering the context, in which (i) substantial concerns about the effectiveness of oral PE had been raised for more than a decade, (ii) the NDAC in 2007 asked for new data on the efficacy of oral PE in light of these concerns, (iii) after 2007 multiple well-designed studies involving large number of patients showed that oral PE was not effective at relieving sinus and nasal congestion, and (iv) prominent organizations representing pharmacists and schools of pharmacy supported the petition to remove oral PE from the OTC market. The scheduling of a meeting for the NDAC to hear this petition and reconsider the GRASE status of oral PE represented a significant regulatory event, one that should have been disclosed. *See id.* ("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described."); *Flynn*, 2016 WL 3360676, at *11 (hypothetical risk disclosures misleading where "serious regulatory issues had already transpired by the time these statements were made").

In addition, the Risk Factor Statement *did* disclose specific times when the risk had already materialized, including the filing of lawsuits against J&J or its affiliates asserting claims relating to Zantac and acetaminophen. Defs. Ex. C at 45-46. The Risk

17

Factor Statement stated that it was "not possible, at this stage, to assess reliably the outcome of these lawsuits or the potential financial impact on the Company." *Id.* A reasonable investor could read these disclosures as impliedly representing that Defendants were unaware of other undisclosed lawsuits or regulatory proceedings that were ***currently pending*** which challenged the "reliability, safety or efficacy" of other drugs used in Kenvue's key products. ¶126.[8]

Defendants argue that the Risk Factor Statement does not specifically mention PE by name and thus cannot be seen as downplaying the risk of future regulatory action concerning PE. MTD 18. The Risk Factor Statement, however, was not limited to a subset of Kenvue's products but made a broad representation that "we believe our products are reliable, safe and effective when used for their intended purposes in accordance with label directions." ¶126. This statement is most reasonably construed as applying to ***all*** of Kenvue's products. And, as discussed above, the Tylenol Studies Statement backed this statement up with a representation that the effectiveness of Tylenol products was demonstrated by third-party studies, a claim that set apart Kenvue's Tylenol products as particularly reliable.

---

[8] Defendants characterize their disclosures about the Zantac and acetaminophen litigation as "***past*** illustrative examples where risks had materialized." MTD 28. But these lawsuits were not merely "past" instances where risks materialized—they were current, pending lawsuits that were not yet resolved. To avoid misleading investors, Defendants also should have disclosed current, pending regulatory proceedings that were not yet resolved that presented material risks to Kenvue going forward.

18

### 3.    The OTC Monograph Statement Was Materially Misleading

The third challenged statement was the OTC Monograph Statement:

***The Over-the-Counter Monograph Safety, Innovation, and Reform Act, enacted in March 2020, is expected to introduce significant reform to the OTC monograph system, including by replacing the FDA's existing rulemaking process with an administrative order process for issuing, revising and amending OTC monographs***.

¶¶130, 140 (emphasis altered).

This statement should not be read in isolation but in the context of the Risk Factor Statement. *See Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."). As discussed above, the Risk Factor Statement was materially misleading because it discussed the hypothetical risk of regulatory action while failing to disclose that there were already pending regulatory proceedings threatening the GRASE status of oral PE.

The OTC Monograph Statement, on the other hand, provided a description of recent changes to the regulatory environment arising from the Over-the-Counter Monograph Safety, Innovation, and Reform Act, which was enacted in 2020 as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). As reflected in Defendants' statement, this new statute was "expected to introduce significant reform . . . by replacing the FDA's existing rulemaking process with an administrative order process for issuing, revising and amending OTC monographs." ¶130. This statement

provided important context to the Risk Factor Statement, because it effectively warned investors that there was a new streamlined process for amending OTC monographs, which could have "significant" and unexpected effects.

What was misleading was Defendants' failure to disclose that *there were already new proceedings initiated under the new system*, and these proceedings threatened the GRASE status of oral PE, a key ingredient in important Kenvue products. As observed in a report by KQED (issued after the NDAC meeting), the NDAC's "vote on phenylephrine" was "the *first test case for the law*." Pls. Ex. 2; *see also* ¶¶96, 131(i). Thus, while Defendants warned about the newly reformed monograph system, they failed to disclose the most important fact related to that risk: that Kenvue was already in the crosshairs of this new system in an important proceeding threatening the continued viability of a key set of products. While the OTC Monograph Statement was literally true in isolation, Defendants' statements read together created a misleading impression of the actual risks facing Kenvue.

**B.    Defendants Failed To Make Required Disclosures Under Item 105**

Irrespective of whether Kenvue's registration statements contained any false or misleading statements, the CAC states an independent claim for a failure to make required disclosures under Item 105 of Regulation S-K. Under Item 105, issuers must provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).

20

Defendants point out that "Item 105 does not 'create[] an independent cause of action.'" MTD 27 (quoting *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 711 n.10 (3d Cir. 2020)). Still, while Item 105 does not itself create a cause of action, a violation of Item 105 can provide the basis for a cause of action under a different provision of the securities laws. For example, in *Jaroslawicz*, the Third Circuit held that a failure to make a required disclosure under Item 105 could support a claim under § 14(a) of the Exchange Act. 962 F.3d at 710-13. In so holding, the Third Circuit relied on the First Circuit's decision in *Silverstrand*, which held that a failure to make a required disclosure under former Item 503 (now recodified as Item 105) can provide the basis for a § 11 claim. *See Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 102 (1st Cir. 2013) ("an actionable § 11 omission may arise when a registration statement fails to comply with Item 303 or 503 [now Item 105]" of Reg S–K); *Jaroslawicz*, 962 F.3d at 713 (discussing *Silverstrand* with approval).[9]

"Item 105 risk factors fall loosely into three broad categories": industry risk,

---

[9] These holdings are confirmed by the Supreme Court's recent decision in *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257 (2024). In *Macquarie*, the Supreme Court held that pure omission claims based on a failure to make a required disclosure under Item 303 of Regulation S–K cannot support a cause of action under § 10(b) of the Exchange Act because "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Id.* at 265. The Supreme Court, however, distinguished claims under § 11 of the Securities Act, because that statute "impose[s] liability for pure omissions." *Id.* at 264; *see also* 15 U.S.C. § 77k(a) (creating liability not only for false and misleading statements but also if a registration statement "omit[s] to state a material fact required to be stated therein").

company risk, and investment risk. *Jaroslawicz*, 962 F.3d at 711 (citing SEC Division of Corp. Fin.: Updated Staff Legal Bulletin No. 7, "Plain English Disclosure," Release No. SLB-7, 1999 WL 34984247 (June 7, 1999)). Issuers must "'specifically link each risk to [the issuer's] industry, company, or investment, as applicable.'" *Id.* (quoting SEC Legal Bulletin No. 7, 1999 WL 34984247, at *5-6).[10]

In *Jaroslawicz*, the defendant stated in its proxy that a proposed merger hinged on regulatory approval and that a determination of the company's anti-money laundering compliance was a key part of the approval process. *Id.* at 714. The defendant, however, provided a boilerplate description of the risks and failed to link its statements "to each risk to its industry, company, or investment using details that connected the pending merger review to its existing and anticipated business lines." *Id.* at 715. In addition, the issuer did not disclose important facts that affected the magnitude of that risk, including shortcomings in its compliance program. *Id.* at 716. The Third Circuit held these facts sufficed to show an Item 105 violation. *Id.*

In this case, Kenvue made a generic disclosure about risks that might arise from regulatory proceedings relating to efficacy concerns about its products, but it failed to identify a specific pending regulatory proceeding that threatened the GRASE status of PE. While the risk of an adverse recommendation by the NDAC concerning PE was not

---

[10] The Third Circuit stated that this SEC guidance was "particularly helpful" in construing the scope of an issuer's disclosure obligations under Item 105. *Id.*

unique to Kenvue and presented a risk for the entire industry, the risk directly affected Kenvue and "its existing and anticipated business lines." *Jaroslawicz*, 962 F.3d at 715. As discussed below, the risk was material. And Defendants knew the risk existed because they "knew the regulators would be looking into" the efficacy of PE due to the scheduling of a meeting for the NDAC to consider whether oral PE should be reclassified as not GRASE. *Id.* at 716.

Thus, "a known risk factor existed at the time of the offering" with respect to the regulatory status of oral PE, *id.* at 713, and Defendants failed to disclose it. This omission is actionable under § 11.

## C.    Plaintiffs' Claims Are Quantitatively Materiality

Defendants state that Kenvue's products containing oral PE represent "just 2% of Kenvue's global revenue." MTD 15. Though Defendants do not directly argue that this amount is immaterial, to the extent that Defendants impliedly raise such an argument, it must be rejected.

In *Adams Golf*, the Third Circuit rejected a similar argument. The district court had dismissed plaintiffs' § 11 claims based on allegations of a "gray market" in a certain line of golf clubs, in part because the court found that 5,000 golf clubs possessed by an unauthorized discount retailer, which represented about 2% of the company's sales for the quarter, was only a "limited number" and thus immaterial. *In re Adams Golf, Inc. Sec. Litig.*, 176 F. Supp. 2d 216, 234 (D. Del. 2001) (holding defendants had no reason

to believe "that the presence of a limited number of golf clubs at one discount retailer was anything more than an isolated incident or that the incident would have any material significance"). The Third Circuit reversed, rejecting the district court's characterization of this amount as immaterial. *Adams Golf*, 381 F.3d at 275 ("these were 5,000 golf clubs out of 235,000, or roughly two percent of the golf clubs sold by Adams Golf that fiscal quarter . . . this figure does not persuade us that the fact was plainly immaterial").

The Third Circuit provided additional guidance, noting that an amount of "more than ten percent" could be viewed as "undoubtedly material," while at the other extreme "just a handful of golf clubs" might be reasonably seen as "obviously immaterial." *Id.* Pursuant to these rules of thumb, courts in the Third Circuit can apply the following guidelines to assertions of quantitative immateriality: (i) amounts of more than ten percent are "undoubtedly material," (ii) amounts of roughly two percent are "not . . . plainly immaterial" and cannot serve as a basis for dismissal at the pleadings stage, and (iii) "just a handful" may be "obviously immaterial" and can support dismissal. The "obviously immaterial" threshold is not a strict numerical benchmark, but under *Adams Golf*, it is obviously something that is meaningfully below two percent.

Additional facts support the conclusion that Defendants' omissions were material at the time of the registration statement. First, for a large, well-diversified company like Kenvue—with hundreds of products, at least 22 "key brands" and numerous smaller brands (MTD 3, 20), a subset of products representing 2% of global revenues on an

ongoing basis is not an insignificant part of the Company's total financial picture. Second, the financial impact of the NDAC's action was not limited to the loss of future revenues for products containing PE. There were multiple additional consequences, including exposure to class action lawsuits by consumers, related legal fees, the potential for recalls (whether voluntary or mandatory) and further regulatory action, and reputational damage. ¶¶115-18.[11] All these consequences were foreseeable as soon the NDAC meeting was scheduled and the reclassification of oral PE was put on the table.

Finally, the market's reaction to the news of the NDAC's vote supports a determination of materiality. On September 12, 2023, the day that the NDAC voted that oral PE was not effective, Kenvue's stock price dropped by 4.58%, suggesting the market felt this event was material. ¶114. As discussed below, the market for Kenvue's stock is not efficient, so its stock price cannot automatically be expected to respond immediately to the disclosure of material information. Nevertheless, the prompt reaction of the stock market to the news is further evidence of materiality and another reason why dismissal on materiality grounds would be inappropriate.

---

[11] In December 2023, ten actions pending in six different districts were organized as a multi-district litigation ("MDL") in the U.S. District Court for the Eastern District of New York. *See generally In re Oral Phenylephrine Marketing and Sales Practices Litig.*, MDL No. 389, --- F. Supp. 3d ----, 2023 WL 8538831 (E.D.N.Y. Dec. 6, 2023). This MDL now includes dozens of lawsuits.

**D.    The Public Availability Of The Omitted Information Does Not Undercut The Materiality Of The Challenged Statements**

Defendants argue that none of the omitted information was material because it was publicly available and this supposedly "defeats Plaintiffs' case entirely." MTD 23. Defendants' argument misconstrues Third Circuit law and attempts to rely on out-of-circuit decisions that are inconsistent with controlling Third Circuit precedent. In the Third Circuit, the public availability of omitted information is one factor in determining its materiality, but it is not dispositive, ***particularly if the market for the stock in question is not efficient***. *See Klein v. Gen. Nutrition Cos., Inc.*, 186 F.3d 338, 342-43 (3d Cir. 1999); *Adams Golf*, 381 F.3d at 276 n.10. In inefficient markets (or markets where efficiency has not been established), the public availability of the omitted information is at most one factor to be considered in the overall materiality analysis and, without more, it is insufficient to show the immateriality of the omitted information. *Adams Golf*, 381 F.3d at 276 n.10.

**1.    Third Circuit Law Bars Defendants' Argument**

Defendants rely on two Third Circuit decisions to support their position that "already-public information is not material." MTD 23-24 (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993); *Klein v. Gen. Nutrition Cos., Inc.*, 186 F.3d 338 (3d Cir. 1999)). Both cases, however, involved efficient markets, and neither supports the broad rule that Defendants propose. And Defendants ignore the most important precedent—*Adams Golf*, which squarely holds that the public disclosure of

26

information does not establish immateriality if a market is not efficient.

In *Trump*, the alleged omission was "the likely effect of the already weakened economy in the Northeast and the potential for competition from casinos located in Las Vegas, Nevada." 7 F.3d at 377. The Third Circuit held that this information was "obvious" and that the "federal securities laws . . . do not compel [a defendant] to state the obvious." *Id.* Thus, *Trump* holds only that "obvious" information is immaterial, not that **all** publicly available information is immaterial.

Likewise, in *Klein*, the alleged omission was the "the existence of a worldwide shortage of deodorized distillate, a material used to produce vitamin E," which was a key ingredient in many of the defendant's supplements. 186 F.3d at 343. The Third Circuit concluded that the vitamin E shortage was not "private, internal GNC information" and reiterated its holding from *Trump* that the "[f]ederal securities laws do not require a company to state the obvious." *Id.* (citing *Trump*, 7 F.3d at 377). In so holding, the Third Circuit emphasized that the complaint had alleged that "the market for GNC stock was an ***efficient market*** which ***promptly digested current information*** regarding GNC ***from all publicly-available sources*** and ***reflected such information in GNC's stock price***." *Id.*

Both *Trump* and *Klein* were fraud-on-the-market cases asserting claims under § 10(b) of the Exchange Act. As the Supreme Court explained in *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988), under the fraud-on-the-market theory, plaintiffs are entitled

to a presumption of reliance if they can plead and prove the existence of an efficient market, because such markets rapidly incorporate all publicly available information into the price of the stock. *See id.* at 246 ("empirical studies have tended to confirm . . . that the market price of shares traded on well-developed markets ***reflects all publicly available information***");[12] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) ("***efficient markets are those in which information important to reasonable investors*** (in effect, the market) ***is immediately incorporated into stock prices***").

In *Trump* and *Klein*, the plaintiffs asserted both Securities Act claims and Exchange Act claims based on a fraud-on-the-market theory, and the plaintiffs were thus bound by the implications of the efficient market theory. The Third Circuit has expressed one of the "clearest commitments" to the efficient market theory,[13] and it strictly holds fraud-on-the-market plaintiffs to the consequences of that theory.[14] By the same token, where plaintiffs ***do not*** plead an efficient market, the Third Circuit ***does not*** assume that all publicly available information is immediately absorbed into a stock's price. The clearest illustration of this principle is in *Adams Golf*.

---

[12] *See also id.* at 248 n.27 ("***threshold facts***" for establishing presumption of reliance include showing that "***that the shares were traded on an efficient market***").

[13] *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005).

[14] *See, e.g., Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002); *Merck*, 432 F.3d at 269.

In *Adams Golf*, the plaintiffs asserted **only** Securities Act claims (under §§ 11, 12(a)(2), and 15) and **no** claims under the Exchange Act, just like Plaintiffs here. Thus, there was no pleading of an efficient market, a fact the Third Circuit found to be crucial for the purposes of its materiality analysis. 381 F.3d at 276 n.10. The plaintiffs in *Adams Golf* alleged two sets of omissions in the defendant's offering materials, one relating to "gray market" sales by unauthorized retailers and another relating to an industry-wide "oversupply" of golf equipment. *Id.* at 271. The Third Circuit treated these claims very differently, based on the obviousness of the omitted information and its breadth of dissemination. With respect to the "oversupply" omissions, the Third Circuit affirmed dismissal, holding that the omissions consisted of "general industry-wide trends easily discernable from information already available in the public domain." 381 F.3d at 279.

With respect to the "gray market" omissions, however, the Third Circuit reversed dismissal, holding that the market was not sufficiently informed about the issue, ***even though the defendant had issued a press release a month prior to the IPO disclosing the relevant facts***. *Id.* at 271, 275-76 & n.10. Even though the press release was publicly available, the Third Circuit nonetheless held that it could not conclude that investors were aware of the facts because they were "announced in a ***single press release*** . . . issued ***a month before the offering materials were filed***." *Id.* at 276 n.10. The Third Circuit distinguished *Klein*, noting that *Klein* involved securities trading in an efficient market whereas there was "no indication that there was any such efficient market in

29

Adams Golf shares prior to the IPO." *Id.*

Applying these principles to this case, dismissal on materiality grounds is not appropriate. First, just like in *Adams Golf*, Plaintiffs have not pled an efficient market, and there is "no indication that there was any such efficient market in [Kenvue] shares prior to the IPO." *Id.*[15] Multiple courts have held that markets for IPO shares ***cannot*** be efficient. *See In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, at *15 n.15 (E.D.N.Y. Aug. 8, 2023) ("A number of cases have pointed out that the IPO market . . . cannot be efficient, because in an IPO . . . there is no well-developed market.").[16] Moreover, determinations of whether a particular market is efficient are generally not proper at the pleadings stage. *See Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 473 n.9 (S.D.N.Y. 2014) ("courts in this Circuit have often found the question of whether a market is efficient to be a question of fact and therefore not meant to be answered on a motion to dismiss"). For these reasons, the Court may not presume that the prices for Kenvue shares during the IPO and Exchange Offer reflected the information about the new regulatory proceedings concerning PE or that this information was part of the total mix

---

[15] Defendants also rely on *Gaer v. Educ. Mgmt. Corp.*, 2011 WL 7277447, at *21 (W.D. Pa. Aug. 30, 2011) (cited at MTD 25). *Gaer* is inapposite because, like *Trump* and *Klein*, it involved both Securities Act claims and Exchange Act claims and was explicitly based on allegations of an efficient market. *Id.* at *24.

[16] *See also In re IPO Sec. Litig.*, 471 F.3d 24, 42-43 (2d Cir. 2006) (market for IPO shares cannot be efficient due to 25-day "quiet period" in which "analysts cannot report concerning securities in an IPO"); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 394 (D. Del. 2010) ("the market for IPO shares is, by definition, neither developed nor efficient").

of information reasonably available to investors. *See* Sec. IV.D.2, *infra*.

Second, the information about the FDA's NDAC proceedings was even less broadly disseminated than the pre-IPO information in *Adams Golf* that the Third Circuit found to be insufficiently disseminated to inform the public. 381 F.3d at 276 n.10. In *Adams Golf*, at least, there was a press release by the company informing investors of the facts that were allegedly omitted from the prospectus. Here though, the omitted information about the NDAC proceedings was not disclosed in any press release, SEC filing, or other disclosure by the Company or J&J. While Defendants have referenced a number of publicly available documents from the FDA, *see* Defs. Ex. B, they have not identified any media reports or analyst reports to show this information was disseminated to investors. Rather, the information was available in a section of the FDA's website that one would have no reason to check unless one already knew about the proceedings. ¶196. "The fact that information may be found publicly if one knows where to look does not make the information 'public' for securities trading purposes unless it is broadly disseminated, or the like." *Lord Abbett Mun. Income Fund, Inc. v. Citigroup Glob. Markets, Inc.*, 2012 WL 13034154, at \*5 (D.N.J. July 12, 2012).

### 2.   The Out-Of-Circuit Cases Relied On By Defendants Do Not Rescue Their Argument

Defendants rely heavily on out-of-circuit decisions to support their position that publicly available information is *per se* immaterial. MTD 24-26. These cases, however, do not support Defendants' categorical position, and to the extent that any of them could

be read so broadly, they are simply inconsistent with Third Circuit law.

First, a number of Defendants' cases are inapposite because they included fraud-on-the-market claims under the Exchange Act. *See, e.g.*, *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1158 (9th Cir. 2009) (Exchange Act and Securities Act); *Sailors v. N. States Power Co.*, 4 F.3d 610, 611 (8th Cir. 1993) (Exchange Act and Minnesota Securities Act); *Johnson v. Pozen Inc.*, 2009 WL 426235, at *1 (M.D.N.C. Feb. 19, 2009) (Exchange Act only); *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 545 (S.D.N.Y. 2021) (Exchange Act and Securities Act).

As discussed above, these cases present a different context, because plaintiffs in such mixed cases are required to plead an efficient market to avail themselves of the fraud-on-the-market presumption of reliance, whereas plaintiffs asserting pure Securities Act claims are not. *See Adams Golf*, 381 F.3d at 276 n.10. In actions involving pure Securities Act claims, the "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011); *see also Miller v. Thane Intern., Inc.*, 519 F.3d 879, 887 n.2 (9th Cir. 2008) (where plaintiffs only asserted claims under §§ 12(a)(2) and 15 of the Securities Act, district court erred in imputing to investors knowledge of earlier drafts of prospectus filed with the SEC: "in an ***action that does not involve the fraud on the market presumption***, that ***truthful information*** is ***available elsewhere does not relieve a defendant from liability*** for

misrepresentations in a given filing or statement").

In addition, § 11 "itself implicitly limits the impact of public information on materiality determinations" due to its affirmative defense of knowledge on the part of the plaintiff. *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 n.12 (2d Cir. 2013). "***If courts held that merely available, as opposed to widely known, public information exposed an untruth or omission, thereby rendering it immaterial, they would effectively shift the burden of proof on § 11's affirmative defense***, presuming that the plaintiff should have known the relevant information rather than requiring the defendant to prove actual knowledge." *Id.* (emphasis altered).[17]

Thus, the Third, Second, and Ninth Circuits all make clear that in the context of pure Securities Act claims, where plaintiffs do not have to plead an efficient market or reliance, Defendants face a much higher burden in trying to establish immateriality on the basis that the omitted information is publicly available.[18]

---

[17] *Accord Merritt v. Molecular Partners AG*, 2024 WL 495140, at *4 (S.D.N.Y. Feb. 5, 2024) (in the context of pure Securities Act claims, "a corporation may be able to charge stockholders with knowledge of information that is '***widely known***,' [but] it cannot do so for information that is '***merely available***'").

[18] The Fifth and Seventh Circuit decisions cited by Defendants do not support Defendants' strict approach. *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004) (cited at MTD 24-25); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989) (cited at MTD 24). *Kapps* held that the "definition of 'material' under Section 11 is ***not strictly limited*** to information that is . . . ***non-public***." 379 F.3d at 213. *Kapps* also concluded that "the *Wielgos* court ***likely did not mean for it to be taken as a strict rule that securities laws never require disclosure of any information*** . . . ***that is publicly available***." *Id.* at 215.

Second, the cases relied on by Defendants involved situations in which the omitted information was much more widely disseminated and obvious to the market than the information at issue here. *See, e.g.*, *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (no duty to disclose labor difficulties when they "were reported countrywide in the press and on radio and television" and "discussed in Congress") (cited at MTD 24); *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 608 (S.D.N.Y. 2022) (no duty to disclose possibility of stricter regulations in China where pre-IPO articles in the *New York Times* and *Wall Street Journal* "put a member of the public with an interest in investing in RLX on clear notice that tightened regulations were under active consideration and worth investigating before investing") (cited at MTD 25).[19] In this case, Defendants have not identified any media reports prior to the IPO discussing the new regulatory proceedings challenging the GRASE status of PE.

Third, while Defendants argue that courts have particularly emphasized the immateriality of publicly available information in the context of public legal and regulatory proceedings (MTD 25-26), the cases cited by Defendants do not suggest that

---

[19] *See also In re Merrill Lynch & Co., Inc. Rsch. Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) (no duty to disclose that Fund's broker-dealer affiliate provided investment banking services to companies in which Fund invested when it was "well-recognized for decades that many mutual fund investment advisers are affiliated with broker-dealers and investment banks" and transactions at issue were reported in SEC filings of 66 different companies) (cited at MTD 25); *Haping v. 17 Educ. & Tech. Grp. Inc.*, 2023 WL 8716895, at *11 (S.D.N.Y. July 20, 2023) (no duty to disclose critical "public comments by politicians and regulators in China" because comments were "already . . . in the public domain") (cited at MTD 25).

issuers never need disclose the pendency of legal or regulatory proceedings. Instead, Defendants' cases stand for the more limited proposition that ***once an issuer discloses the existence of a regulatory proceeding***, it need not disclose all the details about the regulatory process or all subsequent developments relating to that proceeding. *See Sailors*, 4 F.3d at 613 ("***having alerted the market to the existence of regulatory proceedings***, [defendant] had no duty to inform them of each of the steps required in that process"); *id.* at 612 (summarizing the Seventh Circuit's decision in *Wielgos*: "***once a utility has informed investors that it is involved in a regulatory proceeding***, it has no affirmative duty to provide investors with a further summary of the regulatory process"). Here, Kenvue did not inform investors of the existence of the regulatory proceedings, and there is no evidence that investors were otherwise aware of them.

An omission of publicly available information about legal or regulatory matters may be material if that information was not disseminated in a way that sufficiently informs the investing public. *See, e.g.*, *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 415 (S.D.N.Y. 2011) ("The history of the [regulator's] treatment of such petitions may have been publicly discoverable, but it cannot be said to be so manifestly well-known that it was, as a matter of law, already part of the total mix of information available to investors."); *Endo v. Albertine*, 812 F. Supp. 1479, 1487-88 (N.D. Ill. 1993) (oblique reference in prospectus to "certain legal proceedings" and "certain liabilities" was potentially misleading because jury could

35

reasonably find that the defendant "never adequately disclosed the magnitude of [former subsidiary's] environmental liabilities," even though the information was disclosed in three newspaper articles: "We do not believe that these three individual newspaper accounts were disseminated to the public with the sufficient degree of intensity to render this omission immaterial.").[20]

### E.    Defendants' Claim Of Undue Disclosure Burdens Is Unsupported

Defendants argue that the Court should find no duty to disclose in this case because to hold otherwise would supposedly impose unlimited disclosure obligations on issuers. MTD 26-27. This argument finds no support in the facts. Defendants have not identified a single Kenvue product (other than those containing PE) for which there were pending regulatory proceedings that threatened the product's GRASE status. Nor have Defendants identified any other analogous proceedings that they would be required to disclose if the Court were to adopt Plaintiffs' theory of falsity (or Plaintiffs' omission theory under Item 105). Defendants' argument, therefore, is at best speculative and a disingenuous representation of their disclosure obligations.

Moreover, Defendants could have cured the omissions in this case with a short

---

[20] *See also In re MetLife Demutualization Litig.*, 156 F. Supp. 2d 254, 268 (E.D.N.Y. 2001) (rejecting defendants' argument that they "did not have to disclose the costs and procedures for contesting elections in mutual life insurance companies because this information is set forth in the New York insurance law"); *cf. Dolphin and Bradbury, Inc. v. SEC*, 512 F.3d 634 (D.C. Cir. 2008) (information disclosed at public meeting of municipal bond issuer and in local newspaper article "was technically in the public domain," but still "not reasonably available to investors").

paragraph describing the scheduled NDAC meeting and the petition that meeting was scheduled to address. Defendants were not required to confess that the underlying scientific evidence did not support their position. Simply disclosing the pendency of the NDAC meeting would have put investors on notice and allowed them to review the underlying petition and medical studies themselves so that they could make their own assessments about the dispute and the attendant risks.

For the same reasons, Defendants' argument that they were not required to predict the NDAC's vote misses the mark. MTD 31-33. Plaintiffs' theory is not that Defendants were required to predict the NDAC's vote. It is that Defendants needed to disclose that a vote on this issue was coming. Defendants did not have to speculate on the proceeding's outcome, but they did need to disclose the *existence* of the proceedings. This is the same approach to disclosure that issuers must take when facing material litigation risks: the issuer need not speculate about the outcome of a lawsuit, but if the litigation presents a material risk factor, the company must at least identify the lawsuit and briefly describe the gravamen of its claims.[21]

---

[21] Defendants focus on language in the CAC that "regulatory action by the FDA and its NDAC panel was probable and imminent" and that "there was "a high risk of a determination that oral PE was not effective." MTD 31. To be sure, Plaintiffs' position is that regulatory action by the FDA and the NDAC panel was in fact probable and imminent and that there was a high risk that the NDAC panel would determine that oral PE was not effective. Plaintiffs' theory of falsity, however, does not hinge on Defendants agreeing with those assessments; the core allegation is that Defendants' "failure to disclose the pendency of these proceedings … caused investors to materially underestimate the risks that Kenvue faced." ¶127(j).

In this case, the existence of the NDAC proceedings was not a widely known fact, as much as Defendants would like to pretend otherwise. These proceedings presented material risks to Kenvue, and Defendants' statements and omissions misled investors about those risks. Defendants, therefore, needed to provide a concise summary of these proceedings to avoid misleading investors.

## V.   THE CAC ADEQUATELY ALLEGES STANDING

In the Third Circuit, plaintiffs need only allege that they purchased shares "in," "pursuant to," or "traceable to" an offering to sufficiently allege standing under §§ 11 and 12(a)(2). *Suprema*, 438 F.3d at 274 n.7. "For the purposes of determining standing, the court must accept as true all material allegations set forth in plaintiffs' complaint and must construe those facts in favor of the plaintiffs." *Id.* The question of Securities Act standing is a "factual one, to be resolved through discovery" and a matter that should be addressed at summary judgment. *Id.* Defendants' standing arguments conflict with Third Circuit precedent and should be rejected.

### A.   The CAC Adequately Alleges Section 11 Standing

The pleading requirement for § 11 standing is satisfied by general allegations that a plaintiff acquired securities pursuant or traceable to a false or misleading registration statement. *Suprema*, 438 F.3d at 274 n.7; *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992). With respect to Plaintiffs' § 11 claims based on the IPO Registration Statement, Defendants ***concede*** that the CAC adequately alleges that Lead Plaintiff

Ditta's purchases are traceable to the IPO Registration Statement and they do not challenge his standing. MTD 35.

With respect to Plaintiffs' § 11 claims based on the Exchange Offer Registration Statement, Defendants do challenge the standing of Plaintiff Gruthoff. MTD 35-37. This argument fails. The CAC alleges that Gruthoff "acquired shares of Kenvue common stock pursuant and/or traceable to the Exchange Offer Registration Statement." ¶21. In Gruthoff's certification, which was incorporated into the CAC, Gruthoff alleged that his 1,410 shares of J&J stock "were exchanged for" 11,325.684 shares of Kenvue stock following the Exchange Offer. ECF 38-1. The certification further alleges that these shares were exchanged at the ratio announced by J&J of 8.0324:1. *Id.*; ¶77. Thus, the certification makes clear that Gruthoff did not purchase his Kenvue shares on the open market at the market price but that he received those shares in exchange for J&J shares pursuant to the specified terms of the Exchange Offer. These allegations are more than sufficient at the pleading stage. *See Suprema*, 438 F.3d at 274 n.7; *Shapiro*, 964 F.2d at 286 ("plaintiffs need not **prove** their shares are traceable to a false or misleading registration statement at this early stage of the litigation," so long as they allege it).

The Supreme Court did not change the pleading standard in *Slack Technologies, LLC v. Pirani*, 598 U.S. 759 (2023). In *Slack*, the Supreme Court considered whether § 11 liability extended to securities that were purchased following a direct listing, where

39

the plaintiff could not determine whether the shares were registered by the registration statement or unregistered shares that otherwise became eligible for sale due to the direct listing transaction. *Id.* at 764-69. While direct listings present a new method for companies to sell shares publicly without an IPO, the Supreme Court did not adopt a new rule for this transaction type and simply reaffirmed the long-standing rule that "[t]o bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Id.* at 768. For pleading purposes, it is still enough to generally allege that a plaintiff acquired the securities pursuant to or traceable to the defective registration statement. *Alta Partners, LLC v. Forge Glob. Holdings, Inc.*, 2024 WL 1116682, at *7 (S.D.N.Y. Mar. 13, 2024) (holding that *Slack* did not alter the pleading standard in rejecting a similar standing argument).

Defendants also argue that the liberal pleading standard of Rule 8 has been altered by *Iqbal* and *Twombly* such that *Suprema* is no longer good law. MTD 36-37 (citing *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104 (9th Cir. 2013); *In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016)). But *Century* and *Ariad* are not binding, they are inconsistent with *Suprema*, and they set an undue burden for pleading traceability. *See In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *20 n.6 (S.D.N.Y. Aug. 11, 2021) (rejecting the "burdensome pleading standard" of *Century* and *Ariad*).

40

In any event, the CAC does more than make a conclusory allegation of traceability; it alleges specific details—including that the purchases were made in a stock-for-stock exchange at the specified ratio—that exclude the possibility of an open-market purchase. Defendants simply disregard these allegations and claim that because Gruthoff's certification attests that he received Kenvue stock on August 25, 2023, he "may have purchased shares unconnected to the Exchange Offer registration statement." MTD 36. This assertion ignores the transaction details pled in the certification and impermissibly asks the Court to accept a different set of facts. That Gruthoff received his shares on August 25—seven days after the expiration of the Exchange Offer—is neither implausible nor inconsistent with him having obtained those shares through the Exchange Offer. Indeed, J&J stated in its August 23, 2023 announcement of the final results of the Exchange Offer (¶77) that shares of Kenvue common stock would be credited "promptly" in "book-entry form" to tendering shareholders' accounts. Pls. Ex. 3. Thus, J&J *admitted* that tendering J&J shareholders had not yet received their Kenvue shares as of August 23, and they would be receiving those shares "promptly." Defendants' demand for further proof at the pleading stage is inconsistent with Third Circuit law and must be rejected.

## B.  The CAC Adequately Alleges Section 12(a)(2) Claims

Liability under § 12(a)(2) "extends not only to those who pass title to the purchaser, but also to those who successfully solicit the purchase, motivated by their

own or the securities owner's own financial interest[]." *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 636 (3d Cir. 1989). The CAC alleges § 12(a)(2) claims against Kenvue, the Individual Defendants, J&J, and the Underwriter Defendants. Defendants do not argue that the CAC fails to allege standing for its § 12(a)(2) claims against Kenvue, but that it fails to do so for its claims against the other defendants.

In the Third Circuit, a plaintiff need not specifically allege which defendant from whom they purchased shares, *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 716 (3d Cir. 1996), so long as the plaintiff "demonstrate[s] direct and active participation in the solicitation of the immediate sale." *Craftmatic*, 890 F.2d at 636. Defendants argue that the CAC must allege direct communication with the buyer to demonstrate solicitation, citing out-of-circuit authority. MTD 38-39. But to survive a motion to dismiss, a plaintiff need only allege that defendants "solicited plaintiffs to purchase [Kenvue] securities and that in so doing they were motivated by a desire to serve their own financial interests." *Westinghouse*, 90 F.3d at 717.

Consistent with *Westinghouse*, courts in this Circuit have found that allegations similar to those in the CAC are sufficient at this stage. *See, e.g.*, *In re Measurement Specialties, Inc.*, 2003 WL 27398420, at *11-12 (D.N.J. Sept. 29, 2003) (a complaint need not include "specific" allegations of direct and active participation in the solicitation of the sale and an inference of solicitation "reasonably can be drawn from the totality of the circumstances alleged"); *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,

42

2007 WL 81937, at *9 (E.D. Pa. Jan. 9, 2007) (short and plain statement that defendants "were offerors and/or solicitors of sales of the Notes" sufficient); *In re RAIT Fin. Tr. Sec. Litig.*, 2008 WL 5378164, at *9 (E.D. Pa. Dec. 22, 2008) (finding sufficient allegations that defendant was "involve[d] in the preparation of the" registration statement, solicited plaintiffs' purchase of stock, and that it "had a financial interest in the success of the sale").

The CAC also sufficiently alleges that each of these defendants were "motivated by their own or the securities owner's financial interests." *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2015 WL 6039690, at *11 (D. Del. Oct. 15, 2015) (plaintiffs need not use the precise language "motivated by their own or the securities owner's financial interests" so long as the allegations are "sufficient to support such motivation"). The Underwriter Defendants earned over $131 million in fees for their services, which included selling and soliciting Kenvue common stock at a roadshow and marketing Kenvue common stock for the IPO. ¶¶61, 62. J&J was clearly motivated by its financial interests in the Exchange Offer, taking an active role in soliciting the Exchange Offer with the intent of "split[ting]-off at least 80.1%" of its Kenvue holdings. ¶¶75-79. And the Individual Defendants, as officers and directors of Kenvue (¶¶26-39),[22] each "stood

---

[22] Courts have found allegations that a defendant signed a registration statement sufficient to show solicitation. *E.g.*, *In re Steed Finance LDC v. Nomura Secs Int'l*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001); *Briarwood Invs. Inc. v. Care Inv. Tr. Inc.*, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009); *In re Flag Telecom Holdings, Ltd.*

to gain from [Kenvue's] success." *Fisker*, 2015 WL 6039690, at \*11.

## VI.   THE CAC ALLEGES CONTROL PERSON LIABILITY

Section 15 imposes "joint and several liability on the part of one who controls a violator" of § 11 or § 12. *Suprema*, 438 F.3d at 284. To state a claim under § 15, "[a] plaintiff must show that one person controlled another and the controlled person violated securities laws." *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 911 (E.D. Pa. 2018). The CAC adequately alleges violations of §§ 11 and 12(a)(2), so the § 15 claims may not be dismissed for lack of a primary violation. *Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 178 (D. Del. 2010).

Defendants contend that the CAC's allegations are conclusory as to the elements of control and culpable participation. MTD 40. It is unclear whether culpable participation is a required element for pleading a § 15 violation. *See SEB*, 351 F. Supp. 3d at 911 n. 189 (explaining conflict in holdings by district courts in this Circuit). Either way, "allegations that support a reasonable inference that defendants had the potential to influence and direct the activities of the primary violator suffice to plead control person liability." *Dutton*, 270 F.R.D. at 178. Allegations that an individual was a director or officer and signed the offering materials are sufficient to state a claim under § 15. *SEB*, 351 F. Supp. 3d at 911-912; *Dutton*, 270 F.R.D. at 179; *Am. Bus. Fin. Servs.*,

---

*Sec. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005); *see also RAIT*, 2008 WL 5378164, at \*9 (involvement in preparation of registration sufficient).

2007 WL 81937, at *12; ¶¶26-39.

As for J&J, the CAC alleges that Kenvue was controlled by J&J, that J&J owned almost 90% of Kenvue until the completion of the Exchange Offer, and Kenvue admitted that J&J would "continue to control the direction" of its business after the IPO. ¶24. This control was plainly evident: J&J appointed Kenvue's CEO and CFO (¶¶26, 27); had three executives sitting on Kenvue's board of directors (¶¶32, 38, 39); and Kenvue filed the Exchange Offer Registration Statement and Prospectus in conjunction with J&J's offer to exchange its Kenvue shares with J&J shareholders. ¶¶75-79. These allegations are sufficient to allege that J&J "had the ability to influence [Kenvue] at the time of the [IPO and Exchange Offer] such that it could be found to have been a controlling person within the meaning of Section 15." *Dutton*, 270 F.R.D. at 179.

## VII.  CONCLUSION

Defendants' motion should be denied in its entirety. If the Court grants any part of the motion, Plaintiffs request an opportunity to re-plead. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

DATED: July 12, 2024                    Respectfully submitted,

                                        **CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**

                                        By: *s/ James E. Cecchi*
                                        James E. Cecchi
                                        Donald A. Ecklund
                                        Kevin G. Cooper
                                        5 Becker Farm Road
                                        Roseland, New Jersey 07068
                                        Telephone: (973) 994-1700
                                        Email: jcecchi@carellabyrne.com

                                        *Liaison Counsel for Plaintiffs*

                                        **GLANCY PRONGAY & MURRAY LLP**
                                        Robert V. Prongay
                                        Leanne H. Solish
                                        1925 Century Park East, Suite 2100
                                        Los Angeles, California 90067
                                        Telephone: (310) 201-9150
                                        Facsimile: (310) 201-9160
                                        Email: info@glancylaw.com

                                        *Lead Counsel for Plaintiffs*

                                        **THE LAW OFFICES OF FRANK R. CRUZ**
                                        Frank R. Cruz
                                        1999 Avenue of the Stars, Suite 1100
                                        Los Angeles, CA 90067
                                        Telephone: (310) 914-5007

                                        *Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of July, 2024, a true and correct copy of the foregoing document was served via email to the parties registered to the Court's CM/ECF system.

<u>*s/ James E. Cecchi*</u>
James E. Cecchi