<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE KENVUE INC. SECURITIES LITIGATION**<br><br>This Document Relates to ALL CASES | Civil Action No. 23-20998 (ZNQ) (JBD)<br><br>**OPINION** |

<u>**QURAISHI, District Judge**</u>

  **THIS MATTER** comes before the Court upon a Motion to Dismiss Lead Plaintiffs' Joseph Ditta and David Gruthoff (collectively "Plaintiffs") Consolidated Amended Class Action Complaint ("Am. Compl.," ECF No. 38) filed by thirty-four defendants including Kenvue Inc. ("Kenvue"), Thibaut Mongon ("Mongon"), Paul Ruh ("Ruh"), Heather Howlett ("Howlett"), Larry Merlo ("Merlo"), Richard E. Allison, Jr. ("Allison"), Peter M. Fasolo ("Fasolo"), Tamara S. Franklin ("Franklin"), Seemantini Godbole ("Godbole"), Melanie L. Healey ("Healey"), Betsy D. Holden ("Holden"), Vasant Prabhu ("Prabhu"), Michael E. Sneed ("Sneed"), and Joseph J. Wolk (collectively "the Individual Defendants"), Johnson & Johnson ("J&J"), and various investment banks (collectively, "the Underwriter Defendants") (altogether, "Defendants") (the "Motion," ECF No. 86).[1]  Defendants submitted a brief in support of their Motion ("Moving Br.," ECF No. 86-1), a Certification of Defense Counsel (ECF No. 86-2), and various exhibits (ECF Nos. 86-3 to 86-

---

[1] The Underwriter Defendants are Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, BofA Securities Inc., Citigroup Global Markets Inc., Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., RBC Capital Markets LLC, BNP Paribas Securities Corp., UBS Securities LLC, BBVA Securities Inc., ING Financial Markets LLC, Intesa Sanpaolo S.p.A., Santander U.S. Capital Markets LLC, UniCredit Capital Markets LLC, Academy Securities, Inc., Independence Point Securities LLC, Samuel A. Ramirez & Co. Inc., R. Seelaus & Co. LLC, and Siebert Williams Shank & Co. LLC.

14).  Plaintiffs filed an opposition brief ("Opp'n Br.," ECF No. 87), a Declaration of Plaintiffs' Counsel (ECF No. 87-1), and three exhibits (ECF Nos. 87-2 to 87-4).  In addition to the briefs and exhibits, Defendants submitted a letter addressing supplemental authority (ECF No. 91) to which Plaintiffs responded (ECF No. 92).

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[2] For the reasons set forth below, the Court will **DENY** the Motion.

# I.    BACKGROUND AND PROCEDURAL HISTORY[3]

## A.    Procedural History

Plaintiff James Hammond filed an initial complaint in this matter on October 9, 2023.[4] (Compl., ECF No. 1.)  On December 28, 2023, the Court consolidated Civil Actions 23-20998 and 23-22435 into one master file, and appointed Joseph Ditta ("Ditta") as Lead Plaintiff.  (ECF No. 32.)  On March 12, 2024, Ditta and David Gruthoff ("Gruthoff") filed an eighty-page Consolidated Amended Class Action Complaint.[5]  The Amended Complaint alleges various violations of federal securities law including a violation of Section 11 of the Securities Exchange Act of 1933 (the "Securities Act") in connection with the initial public offering ("IPO") against Kenvue, the Individual Defendants, and the Underwriter Defendants (Count One), a violation of Section

---

[2] Hereinafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure unless otherwise noted.
[3] For the purpose of considering this Motion, the Court accepts all factual allegations in the Complaint as true.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).
[4] On December 8 and 9, 2023, various plaintiffs independently filed motions to consolidate Civil Case Numbers 23-20998 and 23-22435, and sought to be appointed as lead plaintiffs.  (ECF No. 15, 16, 17, 18.)  Ultimately, the parties consented to appointing Joseph Ditta as Lead Plaintiff.  (ECF No. 32.)  David Gruthoff was added as a named plaintiff in the consolidated Amended Complaint.
[5] The proposed class includes all persons and entities other than Defendants who "(1) purchased or otherwise acquired shares of Kenvue common stock pursuant and/or traceable to the registration statement and related prospectus issued in connection with Kenvue's initial public offering and suffered compensable damages caused by Defendants' violations of the Securities Act of 1933 and/or (2) acquired shares of Kenvue common stock pursuant and/or traceable to the registration statement and related prospectus issued in connection with Johnson & Johnson's August 2023 exchange offer and suffered compensable damages caused by Defendants' violations of the Securities Act."  (Am. Compl. ¶ 1.)

12(a)(2) of the Securities Act in connection with the IPO against Kenvue, the Individual Defendants, and the Underwriter Defendants (Count Two), a violation of Section 15 of the Securities Act in connection with the IPO against the Individual Defendants and Johnson & Johnson (Count Three), a violation of Section 11 of the Securities Act in connection with an exchange offer against Kenvue and the Individual Defendants (Count Four), a violation of Section 12(a)(2) of the Securities Act in connection with an exchange offer against Kenvue, Johnson & Johnson, and the Individual Defendants (Count Five), and a violation of Section 15 of the Securities Act in connection with an exchange offer against Individual Defendants and Johnson & Johnson (Count Six).

Defendants filed the instant Motion to Dismiss on August 26, 2024.  (ECF No. 86.)

**B.    Factual Background**

1.    <u>Brief Overview</u>

Lead Plaintiffs Ditta and Gruthoff acquired shares of Kenvue common stock; the former acquiring stock pursuant to a Kenvue IPO that went public on May 4, 2023, (Am. Compl. ¶¶ 70–71), and the latter acquiring stock pursuant to an exchange offer, (*id.* ¶¶ 20, 21).  Before the IPO, Kenvue was a company under the umbrella of J&J devoted to consumer healthcare.  (*Id.* ¶ 3.) After the IPO, Kenvue describes itself as "the world's largest pure-play consumer health company" operating at the intersection of healthcare and consumer goods.  (*Id.*)  Kenvue's portfolio of brands includes Tylenol, Sudafed, Benadryl, Neutrogena, Listerine, Johnson's, Band-Aid, Aveeno, Zyrtec, and Nicorette.  (*Id.*)  The Individual Defendants are various executive officers and directors of Kenvue and J&J.  (*Id.* ¶¶ 26–40.)  The Underwriter Defendants are various investment banks, who received approximately $131,164,733.04 in connection with the Kenvue IPO.  (*Id.* ¶¶ 41–59, 61.)

The history begins in November 2021, when J&J announced its intention to spinoff Kenvue. (*Id.* ¶ 4.) After the spinoff, on or about January 4, 2023, Kenvue filed with the Securities and Exchange Commission ("SEC") a registration statement on Form S-1.[6] (*Id.* ¶ 70.) Kenvue then announced an IPO, which closed on May 8, 2023. (*Id.* ¶ 73.) During the IPO, Kenvue sold 198,734,444 shares of common stock at $22.00 per share and raised new proceeds of $4.2 billion. (*Id.* ¶ 4.) After the close of the IPO, J&J continued to own an overwhelming majority of Kenvue shares. (*Id.* ¶ 5.) In July 2023, Kenvue and J&J announced an exchange offer under which J&J shareholders could exchange shares of their stock for shares of Kenvue at a discounted price (the "Exchange Offer"). (*Id.*) After the Exchange Offer was announced, J&J exchanged over 1.5 million shares of Kenvue common stock, which represented approximately 80.1 percent of Kenvue's outstanding common stock. (*Id.*)

In addition to the brief background on the IPO and Exchange Offer, the drug relevant to this litigation is phenylephrine, which is a nasal decongestant in many of the drugs Kenvue markets and sells. (*Id.* ¶¶ 6, 7.) In September 2023, the Food and Drug Administration ("FDA") unanimously voted at a Nonprescription Drug Advisory Committee ("NDAC") meeting that the current scientific data did not support the conclusion that oral phenylephrine was effective as a nasal decongestant. (*Id.* ¶ 13.) Plaintiffs, thus, brought this lawsuit because the registration statements and prospectuses filed by Kenvue in connection with its IPO and Exchange Offer failed to disclose the material risks that Kenvue was facing with respect to the pending regulatory proceeding before the FDA and the NDAC meeting. (*Id.* ¶ 14.) As alleged, Defendants failed to inform investors of the adverse facts related to the evidence suggesting that phenylephrine was ineffective. (*Id.*) Plaintiffs allege that Defendants made misleading statements about the

---

[6] The Court takes judicial notice of the fact that a Form S-1 is used to register securities under the Securities Act of 1933.

regulatory risks facing Kenvue and failed to make required disclosures in Kenvue's offering documents. (*Id.*)  After the NDAC's unanimous vote, Kenvue's share price fell by $1.01 per share or 4.58 percent. (*Id.* ¶ 15.)  And since September 12, 2021, Kenvue's shares have not gone above the $22.00 IPO price, damaging Plaintiffs and the class members. (*Id.*)

Importantly, the Amended Complaint sets forth two categories of misleading statements: (1) those related to the IPO, and (2) those related to the Exchange Offer.  The Court will first provide the factual background behind the IPO and the Exchange Offer, and then proceed with a discussion of the alleged misleading statements.

### 2.    Kenvue's IPO

As briefly explained, after the spinoff, on or about January 4, 2023, Kenvue filed with the SEC a registration statement on Form S-1 in connection with an IPO. (*Id.* ¶ 70.)  On May 3, 2023, J&J and Kenvue announced the pricing of the IPO at $22.00 per share of common stock. (*Id.*)  The following day, Kenvue common stock began trading on the New York Stock Exchange ("NYSE"). (*Id.* ¶¶ 70–71.)  When Kenvue closed its IPO on May 8, 2023, the Defendant Underwriters exercised their option to purchase approximately 25 million shares. (*Id.* ¶ 73.)  The total shares sold in the IPO—198,734,444—represented approximately 10.4 percent of Kenvue's outstanding shares, with J&J owning an overwhelming majority of the outstanding shares. (*Id.*)  As part of the IPO, Kenvue received approximately $4.2 billion which it intended to use as partial consideration to J&J for the consumer health business that J&J transferred to Kenvue in connection with the IPO. (*Id.* ¶ 74.)

### 3.    Exchange Offer

In July 2023, J&J owned 80.1 percent of Kenvue shares. (*Id.* ¶ 75.)  Around that same time, J&J and Kenvue announced the Exchange Offer. (*Id.*)  In the announcement, J&J explained that the Exchange Offer would permit J&J shareholders to exchange their common stock for shares

of Kenvue common stock at a seven percent discount. (*Id.*) Kenvue then filed with the SEC its registration statement on Form S-4 in connection with the Exchange Offer. (*Id.* ¶ 76.) On August 16, 2023, J&J announced the final exchange ratio for the Exchange Offer, which ended on August 18, 2023. (*Id.* ¶ 77.) As a result of the Exchange Offer, J&J accepted 190,955,436 shares of J&J common stock in exchange for 1,533,830,450 shares of Kenvue common stock. (*Id.*) As alleged, the Exchange Offer was oversubscribed, and J&J "accepted only a portion of the shares of its common stock that were validly tendered on a *pro rata* basis of 23.23%." (*Id.* ¶ 78.) Notably, as explained in the Amended Complaint, shareholders who owned fewer than 100 shares of J&J common stock or an "odd-lot" and who validly tendered all their shares were not subject to proration, and all these shares were accepted. (*Id.*) At the completion of the Exchange Offer, J&J retained approximately 9.5% of the outstanding shares of Kenvue common stock. (*Id.* ¶ 79.)

### 4. Phenylephrine

As explained briefly above, phenylephrine is central to this case. Phenylephrine (commonly referred to as "PE") is an over-the-counter nasal decongestant and is an ingredient in numerous drugs marketed and sold by Kenvue.[7] (*Id.* ¶¶ 84–85.) Over the years, the FDA and NDAC convened to discuss whether PE was generally recognized as safe and effective ("GRASE"). (*Id.*) Many doctors and scholars have studied PE and conducted trials, and their findings with respect to its efficacy and safety have fluctuated. (*Id.* ¶¶ 83–90.) In addition to independent studies, the FDA utilizes its monograph system to establish conditions, such as active ingredients, indications, dosage form, and labeled directions, under which an over-the-counter drug is GRASE. (*Id.* ¶ 81.)

---

[7] PE works by constricting the blood vessels in the nasal passage. It is contained in various over-the-counter oral cough, cold, and allergy products. (Am. Compl. ¶ 85.)

In March 2023, the FDA announced on its public "Advisory Committee Calendar" that it was having an NDAC meeting to discuss PE and whether it should be recognized as safe and effective. (*Id.* ¶ 93.) After multiple adjournments, on September 11 and 12, 2023, the FDA held its NDAC meeting to discuss the adequacy and efficacy of PE and whether it should be classified as GRASE. (*Id.* ¶ 99.) At the meeting the Consumer Healthcare Products Association ("CHPA"), of which Kenvue is a member, advocated for continued use of PE. (*Id.*)

After reviewing the medical trials, data, scientific evidence, and studies, the FDA concluded that orally administered PE is not effective as a nasal decongestant. (*Id.* ¶ 106.) Thereafter, the NDAC unanimously voted the same. (*Id.* ¶ 107.) Immediately after the NDAC's vote, various news outlets reported on the efficacy of PE. (*Id.* ¶¶ 110–113.) As a result, and as already noted above, Kenvue's share price fell by $1.01 per share to close at $21.06 on September 12, 2021, down from $22.07. (*Id.* ¶ 114.) Consequently, Kenvue's future prospects were allegedly damaged because it (1) might have to recall products, (2) might need to reformulate its nasal decongestant products, (3) could face regulatory action, (4) could be exposed to liability for false advertising or fraud, (5) could face reputational damage, and (6) might severely limit Kenvue's ability to sell products containing PE. (*Id.* ¶ 115.)

Plaintiffs allege that despite the NDAC's unanimous vote and the various news outlet reports on PE, Kenvue still "extol[ed] the benefits of its oral PE products on the product's packaging, while containing only limited disclosure on these products' websites about the NDAC's determination about the efficacy of oral PE." (*Id.* ¶ 119.) For example, on March 8, 2024, Kenvue still advertised Sudafed PE Sinus Congestion as a "maximum strength" nasal decongestant, and the packaging failed to disclose the FDA's findings about the drug's efficacy. (*Id.* ¶ 120.) Kenvue

similarly advertised other drugs, with limited disclosure about the FDA's findings and the NDAC's meeting and vote.  (*Id.* ¶¶ 121–122.)

     5.   <u>Materially False and Misleading Statements</u>

The Amended Complaint sets forth two categories of false and misleading statements: (1) those related to the IPO, and (2) those related to the Exchange Offer.

     a)   <u>The IPO</u>

Plaintiffs allege that in light of the above-mentioned facts, Kenvue's registration statements with the SEC contained materially false and misleading statements and omissions, and failed to make the required disclosure under Item 105 of the SEC Regulations S-K.[8]  (*Id.* ¶ 123.)  In addition, Plaintiffs allege that Defendants made material misrepresentations and omissions in their S-1, which was utilized in the IPO, and the five subsequent amendments to the S-1 IPO registration statement.  (*Id.* ¶¶ 124, 125, 126.)

Specifically, in the Risk Factors Section of the IPO Registration Statement, Kenvue stated that "[c]oncerns about the reliability, safety or efficacy of our products . . . could result in litigation, regulatory action, reputational damage, product recalls, . . . which could adversely affect our business."  (*Id.* ¶ 126.)  Plaintiffs allege that the statements in the IPO Registration Statement were materially misleading because they failed to disclose that (1) there were substantial and proven concerns about the efficacy of PE, (2) trials and studies existed showing the drug was ineffective, (3) Kenvue lacked a reasonable basis for stating its products were reliable and safe when used for their intended purposes, (4) regulatory action by the FDA and its NDAC panel was probable and imminent, and (5) regulatory action and lawsuits have already been initiated.  (*Id.* ¶ 127.)

---

[8] Item 105 requires that offering documents provide a discussion of the material factors that make an investment in the offering or registrant speculative or risky.  17 C.F.R. § 229.105(a).

Plaintiffs also allege that the IPO Registration Statement and Prospectus made no reference to PE by name, and instead stated that "studies sponsored by Johnson & Johnson Consumer Inc. and by third parties have shown that these products help relieve . . . sinus and nasal congestion." (*Id.* ¶ 128.)  Plaintiffs emphasize that the phrase "these products" includes PE and that, in light of the FDA and NDAC vote, that statement is misleading.  As alleged, the IPO Registration Statement and Prospectus further misled Plaintiffs by discussing the FDA's monograph system but also explaining that the Monograph Safety, Innovation, and Reform Act was expected to create reform in the FDA's monograph system.  (*Id.* ¶ 130.)  Additionally, Plaintiffs allege that Defendants failed to adequately disclose the specific risk factors for PE in its Item 105 of Regulation S-K, which requires that offering documents provide a discussion of the material factors that make an investment speculative or risky.  (*Id.* ¶¶ 132, 133.)

b)    <u>The Exchange Offer</u>

After Kenvue filed its registration statement on Form S-4 with the SEC, it filed various amendments to the Form S-4.  (*Id.* ¶ 134.)  Plaintiffs allege that Defendants failed to disclose the risk factors for PE in the Exchange Offer Registration Statements and Prospectus because it omitted the adverse facts that (1) there were substantial concerns about the efficacy of PE, (2) there were well-documented and reported studies and trials on PE concluding that it was not GRASE, and (3) FDA regulation was probable and imminent in light of the NDAC meeting and vote.  (*Id.* ¶ 137.)

Further, Plaintiffs allege that the Exchange Offer Registration Statement "touted the strength" of Kenvue's brands and the efficacy of its products.  (*Id.* ¶ 138.)  In fact, the Amended Complaint explains that the Exchange Offer Registration Statement provided no mention of PE, but did discuss other drugs, thereby misleading investors.  (*Id.*)  Plaintiffs also claim that the Exchange Offer Registration Statement made misleading statements with respect to the FDA's

9

monograph system, similar to the IPO statements. (*Id.* ¶ 140.) Lastly, Plaintiffs allege that the Exchange Offer Registration Statement did not provide a specific discussion of the material factors that would make an investment in the registrant or offering risky, in violation of Item 105. (*Id.* ¶ 142.) Specifically on this point, Plaintiffs contend that Defendants failed to disclose the risks of Kenvue's sales, revenue, prospects, and potential liability related to PE and that it failed to disclose "specific facts necessary for investors to understand the magnitude of the risk, including the FDA's initiation of regulatory proceedings." (*Id.* ¶ 143.)

## II.    <u>SUBJECT MATTER JURISDICTION</u>

The Court has subject matter jurisdiction over Plaintiffs' claims under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1331.

## III.    <u>LEGAL STANDARD</u>

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550

U.S. at 555).  Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).  A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 663).  On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented."  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## IV.    <u>DISCUSSION</u>

As a threshold matter, although complaints in securities litigation often raise issues of fraud, the claims brought here pursuant to Sections 11, 12, and 15 of the Securities Act do not assert fraud.  Plaintiffs specifically allege for each count that they do not claim "any of the defendants . . . engaged in intentional or reckless misconduct or acted with fraudulent intent." (Am. Compl. ¶¶ 152, 164, 171, 180, 192, 199.)  The claims are thus subject to the liberal pleading requirements of Rule 8.  *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 n.5 (3d Cir. 2004) ("[C]laims under the 1933 Act that do not sound in fraud are not held to the heightened pleading requirements of [Rule] 9(b)."); *In re Suprema Specialties*, 438 F.3d at 270 ("Where a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply.").

The Amended Complaint alleges six counts stemming from statements made related to Kenvue's IPO and the Exchange Offer in violation of Sections 11, 12, and 15 of the Securities Act. The Court will address each allegation beginning with a discussion on statutory standing, given that the parties contest whether Plaintiffs have standing.

### A.    Section 11 and 12 Standing[9]

Defendants concede that Ditta has standing.  (Moving Br. 35.)  As to Gruthoff, Defendants argue that Sections 11 and 12(a)(2) of the Securities Act impose strict standing requirements that Plaintiffs have not satisfied.  (Moving Br. at 33–34.)  Defendants protest that the Amended Complaint does not allege that Gruthoff made any purchases of shares after the Exchange Offer, and therefore, the Section 11 claims should be limited to the period between the IPO and the August 18, 2023 expiration of the Exchange Offer.  (*Id.* at 34.)  Defendants argue that once the Exchange Offer was complete, it is hard to trace where Gruthoff's shares were purchased from.  (*Id.* at 35.)  For example, Defendants explain that Gruthoff received Kenvue stock on August 25, 2023, seven days after the Exchange Offer expired, and thus, by that time, "shares registered to the Exchange Offer Registration Statement were intermingled with shares registered to the IPO Registration Statement."  (*Id.* at 36.)

In opposition, Plaintiffs maintain that the Amended Complaint adequately alleges Section 11 standing because it shows that Plaintiffs acquired securities that were traceable to a false or misleading statement.  (Opp'n Br. at 38.)  In response to Defendants' standing concerns related to Gruthoff, Plaintiffs argue that the Gruthoff Certification shows that his J&J shares were exchanged for shares of Kenvue following the Exchange Offer, irrespective of when the Exchange Offer expired.  (*Id.* at 39.)

With respect to Section 12(a)(2) standing, Defendants argue that Plaintiffs do not have standing to sue the Individual Defendants, J&J, and the Underwriter Defendants because they fail

---

[9] The parties frame their arguments as related to the issue of Plaintiffs' "standing" under Section 11 and Section 12 of the Securities Act, but the arguments may be "more properly characterized as arguments about the scope of the cause of action because they do not, as standing does, go to this Court's subject matter jurisdiction."  *Lozada v. TaskUs, Inc.*, Civ. No. 22-1479, 2024 WL 68571, at *15 n.19 (S.D.N.Y. Jan. 5, 2024) (citing *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)) ("[A] plaintiff must have a cause of action under the applicable statute.  This was formerly called statutory standing." (internal quotation marks omitted)).  Notwithstanding, the Court will utilize the same terminology the parties used in their briefing.

to plead that they made direct purchases from those defendants or that those defendants engaged in solicitation. (Moving Br. at 37–39 (citing *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 684 (3d Cir. 1991))). Defendants argue that Plaintiffs lack standing because there are no facts pled about what these defendants did to directly or actively solicit Plaintiffs' purchases. (*Id.* at 38.) Consequently, Defendants argue that the Section 12(a)(2) claims should be limited to Kenvue only. (*Id.* at 39.)

In response, Plaintiffs argue that they need not specifically allege which defendant they purchased shares from so long as Plaintiffs demonstrate direct and active participation in the solicitation of a sale, which they maintain the Complaint sufficiently alleges. (Opp. Br. at 42.) Plaintiffs also argue that they have alleged that the Underwriter Defendants received a monetary benefit for their services. (*Id.* at 43.)

Section 11 of the Securities Act provides statutory standing to purchasers "who acquired securities issued 'pursuant to' or 'traceable to' the specific offering documents that are alleged to be false or misleading." *De Vito v. Liquid Holdings Grp., Inc.*, Civ. No. 15-6969, 2018 WL 6891832, at *15 (quoting *Suprema Specialties*, 438 F.3d at 274 n.7); *see also Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023) (holding Section 11 requires "a plaintiff to plead and prove that he purchased shares traceable to the allegedly defective registration statement"). Notably, "[t]he pleading requirement for Section 11 standing is satisfied by general allegations that [the] plaintiff purchased [shares] pursuant to or traceable to [a] false registration statement." *Alta Partners, LLC v. Forge Glob. Holdings, Inc.*, Civ. No. 23-2647, 2024 WL 1116682, at *7 (S.D.N.Y. Mar. 13, 2024) (quoting *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011)); *City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403

(S.D.N.Y. 2020) ("[Plaintiff] alleges that it purchased [defendant's] stock pursuant or traceable to the offerings. . . .  This is enough to confer standing at this stage to assert a [Section] 11 claim.").

Additionally, under Section 12, the purchase of securities must be pursuant to a materially false or misleading prospectus or oral communication.  *Suprema Specialties*, 438 F.3d at 276 n.7. Section 12 liability "cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption)."  *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 571 (1995).

Here, the Amended Complaint alleges that "Plaintiff David Gruthoff . . . acquired shares of Kenvue common stock pursuant and/or traceable to the Exchange Offer Registration Statement issued in connection with the Exchange Offer, and was damaged thereby."  (*Id.* ¶ 21.)  Moreover, Gruthoff's Certification attached to the Amended Complaint attests that he exchanged 1,410 shares of J&J stock for 11,325.684 shares of Kenvue stock at a ratio of 8.0324:1 following an Exchange Offer held by J&J.  (ECF No. 38-1.)  It is immaterial that Gruthoff acquired shares after the expiration of the Exchange Offer because he has still adequately alleged that he acquired shares as a result of the alleged misleading statements pertaining to the Exchange Offer.  The Court therefore finds that the Amended Complaint meets the Securities Act's liberal pleading requirements for statutory standing and that Plaintiffs have standing to bring their Section 11 and 12 claims against Kenvue.

The Court also finds that Plaintiffs have adequately alleged statutory standing to bring their claims against the Individual Defendants, the Underwriter Defendants, and J&J.  The Amended Complaint alleges that

> [e]ach of the Officer Defendants signed the IPO Registration Statement and Exchange Offer Registration Statement, solicited the investing public to purchase or otherwise acquire shares of common stock issued pursuant thereto, hired and assisted the underwriters,

planned and contributed to the IPO, the Exchange Offer, the IPO Registration Statement, the Exchange Offer Registration Statement, and promotions to meet with and present favorable information to potential Kenvue investors, all motivated by their own and the Company's financial interests.

(Am. Compl. ¶ 29.)  Importantly, Plaintiffs allege that "[t]he Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of Kenvue common stock in the IPO," (*id.* ¶ 62), and that "[t]he Underwriter Defendants solicited and sold shares of Kenvue common stock to Plaintiffs and other members of the Class in the IPO," (*id.*). (*See also id.* ¶¶ 165, 193.)  In addition to these factual allegations, Plaintiffs allege that the Underwriter Defendants earned fees for their services based on selling and soliciting Kenvue common stock.  (*Id.* ¶¶ 61, 62).

Thus, when the Amended Complaint is read as a whole, the Court finds that it plausibly alleges that the Underwriter Defendants, the Individual Defendants, and J&J were motivated by their financial interest in either the IPO and/or the Exchange Offer.  *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 (3d Cir. 1996) (finding that there was standing to bring a Section 12 claim because the complaint alleged that the defendants "solicited plaintiffs" to purchase securities and that in so doing they were motivated by a desire to serve their own financial interests.). Accordingly, the Court finds that the Amended Complaint sufficiently pleads either direct purchases and/or solicitation from Defendants, and that Plaintiffs therefore have statutory standing to pursue their claims.

**B.    Section 11 and 12 Claims**

Having concluded that Plaintiffs have statutory standing, the Court proceeds to consider whether Plaintiffs have stated a claim under Sections 11 and 12 of the Securities Act.  In the Motion, Defendants argue that Plaintiffs' Section 11 and Section 12(a)(2) claims should be

dismissed because (1) the challenged statements were not misleading, (2) there was no duty to disclose the allegedly omitted facts, (3) Kenvue's opinion statements are not actionable because Plaintiffs do not allege that Defendants did not sincerely believe the opinion statements, and (4) Kenvue is not required to predict the NDAC's vote. (Moving Br. at 16.) In opposition, Plaintiffs argue that Defendants are liable because Sections 11 and 12 of the Securities Act create near-strict liability for misleading statements or omissions in registration statements and prospectuses, and that Defendants' statements were in fact misleading. (Opp'n Br. at 8–20.)

       1.   Section 11 Claims

Under Section 11 of the Securities Act, an individual that has acquired the relevant security may bring a private action for damages "if [the] registration statement, as of its effective date: (1) 'contained an untrue statement of material fact'; (2) 'omitted to state a material fact required to be stated therein'; or (3) omitted to state a material fact 'necessary to make the statements therein not misleading.'" *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 167 (3d Cir. 2004) (quoting 15 U.S.C. § 77k(a)). "Section 11 'was designed to assure compliance with the disclosure provisions of the [Securities Exchange] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.'" *Suprema Specialties*, 438 F.3d at 269 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983) (footnote omitted)). Indeed, "Section 11 is a 'virtually absolute liability provision[], which do[es] not require plaintiffs to allege that defendants possessed any scienter.'" *Id.* (quoting *In re Adams Golf*, 381 F.3d at 274 n.7). In other words, "Section 11 imposes near-strict liability for untruths and omissions made in a registration statement." *Obasi Inv. LTD v. Tibet Pharms., Inc.,* 931 F.3d 179, 182 (3d Cir. 2019).

The majority of the debate in this case is whether Defendants omitted facts from their IPO and Exchange Offer registration statements and prospectuses that they were required to disclose. An omitted fact is material where "there is a substantial likelihood that a reasonable [investor]

would consider it important." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 196 (2015) (quoting *TSC Indus., Inc. v. Northway*, Inc., 426 U.S. 438, 449 (1976)). There is no "affirmative duty to disclose any and all material information. Disclosure is required only when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (internal quotation marks omitted). "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor: The inquiry . . . is objective." *Omnicare*, 575 U.S. at 186–87.

In the Motion, Defendants argue that none of the statements in the IPO or Exchange Offer Registration Statements were factually inaccurate or misleading. (Moving Br. at 3.) Defendants rely on the IPO Registration Statement and the final IPO Prospectus, which both contained extensive cautionary language. (*Id.* at 6.) Defendants argue that the purported omissions were publicly available information and not a violation of the Securities Act. (*Id.* at 14, 21–22, 24–26).[10] Moreover, Defendants contend that any purported omission did not create any misleading impression about PE. (*Id.*) With respect to the Risk Factor Statements in both the IPO and Exchange Offer Registration Statements, Defendants argue that Kenvue properly warned investors of the specific type of risk. (*Id.* at 17.) Fatal to Plaintiffs' claims, according to Defendants, is that Kenvue did not downplay or characterize all the possible future regulatory risks regarding PE, so there was no false impression about it. (*Id.* at 18, 20–21.)

With respect to the statements including reference to the FDA monograph system, (Am. Compl. ¶¶ 130, 131, 140, 141), Defendants argue that the information in the IPO and Exchange

---

[10] On this point, Defendants argue that Plaintiffs' allegations are "nonsensical" because the IPO and Exchange Offer Registration Statements were already more than 700 pages each and adding more information about studies and trials, that were already known to the public, would be unhelpful and inundate the investor with an "avalanche" of information. (Moving Br. at 26.)

Offer Registration Statements were not misleading because they merely explained what the monograph system is, and no reasonable investor would be misled by such information. (Moving Br. at 21.) Regarding Plaintiffs' allegations that Kenvue misled investors by omitting facts from their Item 105, Defendants argue that Item 105 does not create an independent cause of action and the Court should dismiss such a claim as redundant of Plaintiffs' Sections 11 and 12 claims. (*Id.* at 27.) Defendants separately contend that Kenvue properly stated the risk factors in its Item 105. (*Id.* at 28.)

Plaintiffs argue that the challenged statements were materially misleading because the statements pertaining to Tylenol (Am. Compl. ¶¶ 128, 138) include the "full suite" of Tylenol products that includes PE as an active ingredient for many drugs in that suite. (Opp'n Br. at 10.) The statements, when read as a whole, are misleading to a reasonable investor because, according to Plaintiffs, they show that (1) Defendants believed PE to be effective at relieving congestion, and (2) the available scientific evidence supported that belief, contrary to other evidence, trials, studies, and findings stating otherwise. (*Id.* 10–11, 14.) Plaintiffs argue that once Defendants touted the market with positive information about Tylenol and their other products, Defendants were required to disclose evidence of PE's ineffectiveness. (*Id.* at 11.)

Plaintiffs next argue that Defendants failed to disclose the possibility of future regulatory proceedings or litigation and that such proceedings or litigation had already begun. (*Id.* at 15 (citing *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009))). Plaintiffs argue that Defendants should have discussed the NDAC's vote in its Risk Factors and that it is immaterial that the FDA has not commenced regulatory proceedings because the FDA's administrative process is slow. (*Id.* at 16.)[11] Plaintiffs also contend that the NDAC meeting was

---

[11] In a reply brief, Defendant argues that it was impossible for Kenvue to discuss the NDAC vote in its IPO Registration Statement because the NDAC meeting was not yet scheduled by the FDA. (Reply Br. at 3.) This argument lacks

a regulatory action and serious enough to require disclosure in a Risk Factor Statement. (*Id.* 16–17 (citing *Shaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020))). With respect to the FDA monograph statements, (Am. Compl. ¶¶ 130, 140), Plaintiffs argue that the statements failed to disclose that there were already new proceedings initiated under the new monograph system, and that these new proceedings threatened the GRASE status of oral PE. (*Id.* at 20.) Regarding the alleged failure to make disclosures under Item 105, Plaintiffs argue that a violation of Item 105—although itself does not create a cause of action—can provide the basis for a cause of action under a different provision of the securities laws, like Section 11 in this case. (*Id.* at 21, 23.)

As a final point, in response to Defendants' argument that the omitted adverse facts were public information, Plaintiffs insist that the public disclosure of information does not establish immateriality if a market is not efficient. (*Id.* at 27.) In other words, where Plaintiffs do not plead an efficient market, as is the case here, Plaintiffs argue that the Third Circuit does not assume that all publicly available information is immediately absorbed into a stock price. (*Id.* at 28 (relying on *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005))).

Here, for reasons set forth below, the Court finds that some of Defendants' statements were misleading while others were not. The Court will analyze the statements made in conjunction with the IPO Registration Statement and IPO Prospectus first, and then will proceed with the statements made in connection to the Exchange Offer.

---

merit because the IPO Registration Statement was made on May 3, 2023, and although the NDAC meeting was held on September 11 and 12, 2023, the Amended Complaint alleges that Kenvue was aware of the existence of the NDAC meeting at the time it issued the Statement.

a)     <u>IPO Statements</u>

Plaintiffs allege that in the Risk Factor Section of the IPO Registration Statement, Kenvue stated that "[c]oncerns about the reliability, safety or efficacy of our products . . . could result in litigation, regulatory action, reputational damage, product recalls, . . . which could adversely affect our business."  (Am. Compl. ¶ 126.)   Contrary to Plaintiffs assertions, this statement is not misleading because it sufficiently warns investors that there may be concerns about Defendants' products.  The statements further explain that Kenvue has "faced, and could face in the future, concerns about the reliability, safety or efficacy of the ingredients used in our products."  (*Id.*) This part of the risk factor statements, again, were not misleading because they contain cautionary language about risk and future concerns.

However, the second part of the Risk Factor statements provides that "we believe our products are reliable, safe and effective when used for their intended purposes in accordance with label directions."  (*Id.*)  The Court agrees with Plaintiffs that they have properly alleged that this statement is misleading.  Although Defendants use the words "we believe," this statement fails to disclose that there was evidence that PE was not generally safe and effective as a nasal decongestant.  The Amended Complaint in fact describes some studies that concluded PE was not safe or effective.  (Am. Compl. ¶¶ 83–90.)  A defendant need not cite every existing study about a drug, but it must provide sufficient information for an investor to be able to make an informed decision about where to invest its money.  The studies on PE were not just "some fact[s] cutting the other way," as Defendants argue.  (Reply Br. at 9)  The Court therefore finds that the Amended Complaint plausibly alleges that such omitted information would have been important to an investor's decision to purchase Kenvue stock especially because PE was a significant source of revenue for Kenvue.  *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016).

On top of this, the Risk Factors in the IPO Registration Statement also fail to discuss that an NDAC meeting and vote was imminent, information that may have been important to a reasonable investor.  *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 377 (3d Cir. 1993). Although the NDAC meeting was publicly listed on the FDA calendar, and at the time of the IPO Statement, a final date for the meeting was not yet scheduled, the Court finds that the mere fact that the FDA and NDAC were reviewing PE may have been crucial to a reasonable investor's decision to invest in Kenvue; it thus should have been disclosed to some degree.  Having read the statement in full, the Court cannot infer that a reasonable investor would know about the serious challenge to PE's effectiveness based on information then available to the public.[12]

Consequently, the Court finds that Plaintiffs have sufficiently alleged that some of the statements made in the Risk Factor Section of the IPO Registration Statement (Am. Compl. ¶ 126) were misleading.

Additionally, Plaintiffs allege that the statements in the IPO Registration Statement and Prospectus touted the strength of Kenvue's brands and provided that studies existed showing Kenvue's products relieved sinus and nasal congestion.  (*Id.* ¶ 128 ("Studies sponsored by Johnson & Johnson Consumer Inc. and by third parties have shown that these products help relieve, among other things . . . sinus and nasal congestion")).  This statement is problematic for the same reason: Defendants failed to disclose that studies and trials existed that seriously questioned PE's effectiveness.  It is immaterial that the statements did not specifically mention PE because a reasonable investor—when reading the statements in context—would understand that Kenvue's

---

[12] Defendants rely on *In re Ocugen, Inc. Sec. Litig.*, App. No. 23-1570, 2024 WL 1209513, at *3 (3d Cir. Mar. 21, 2024), for the proposition that information that is readily available to an investor is not misleading.  (Reply Br. at 11.) That decision, however, is distinguishable because there, Ocugen disclosed a "great deal of information about its departures from FDA guidance" including "data about" clinical studies.  *In re Ocugen*, 2024 WL 1209513, at *5. Here, Defendants provided no information whatsoever about the existence of the many clinical studies cited by Plaintiffs that could inform investors about the safety and efficacy risks of PE.

products included PE.  Again, Defendants were not required to disclose and explain every study and finding, but a reasonable investor would have wanted to know that some studies existed that disputed Defendants' statement that Kenvue products help to relieve nasal congestion.  The Court is therefore satisfied that Paragraph 128 plausibly alleges a misleading statement.

In addition to the statements referenced above, Plaintiffs allege that the IPO Registration Statement and IPO Prospectus contained false statements about the monograph system.  (*Id.* ¶ 130.)  The Court reviewed these allegations and finds that the monograph statements merely explained the monograph system and that there was a federal act that had reformed the system. The Court therefore finds that the Amended Complaint has not plausibly alleged that the statements in Paragraph 130 would mislead a reasonable investor.

With respect to the Item 105 Regulation S-K, Plaintiffs allege that the Item 105 failed to disclose specific risks relating to Kenvue's products.  The text of Item 105 directs issuers to:

> [w]here appropriate, provide under the caption "Risk Factors" a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply generically to any registrant or any offering. Explain how the risk affects the registrant or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk. . . .  The registrant must furnish this information in plain English.

17 C.F.R. § 229.105; *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 711 (3d Cir. 2020).  Item 105 requires disclosure of the most significant factors known to make an investment speculative or risky.  *Id.*  Because the Court has already found that Defendants failed to disclose certain required information in its Registration Statements and Prospectuses, the Court need not address whether the violation of Item 105 constitutes a material misrepresentation under Sections 11 and 12 of the Securities Act.

In sum, the Court finds that the Amended Complaint plausibly alleges that the statements contained in Paragraphs 126 and 128 were misleading.  The statements in Paragraph 130 were not sufficiently pled as misleading.  Accordingly, the Court finds that Plaintiffs have stated a claim under Section 11 with respect to the IPO Registration Statements and Prospectuses.

b)    <u>Exchange Offer Statements</u>

With respect to the Exchange Offer statements, Plaintiffs allege that Kenvue filed a Form S-4 that contained misleading statements.  For example, Defendants wrote in the Form that

> [c]oncerns about the reliability, safety or efficacy of Kenvue's products or their ingredients, whether raised internally or by litigants, regulators, consumer advocacy groups, third-party interest groups or others, and whether or not based on scientific or factual evidence, have resulted, and could in the future result, in governmental investigations, regulatory action (including the shutdown of manufacturing facilities), private claims and lawsuits significant remediation and related costs, safety alerts, product shortages, declining sales or reputational damage (including damage to brand image, brand equity and consumer trust in Kenvue's products). . . .

(Am. Compl. ¶ 136.)  For the same reasons as discussed above, this part of the statement is not misleading because it warned investors that concerns "have resulted" and "could in the future result."  (*Id.*)  However, later in the same statement, Defendants provide that "Kenvue believes its products are reliable, safe, and effective when used for their intended purposes."  (*Id.*)  For reasons already articulated, the Court finds this statement misleading.

Additionally, the Exchange Offer Registration Statement and Prospectus indicated that there were studies showing that Kenvue's products help relieve sinus and nasal congestion.  (*Id.* ¶ 138.)  This statement again fails to discuss the existence of other studies that concluded the contrary.  The statement also failed to discuss the very real possibility that the FDA could find PE ineffective, in light of the studies and upcoming NDAC meeting.  The parties devote a portion of their briefs to the fact that the statement in Paragraph 138 does not include references to PE.  This

23

is immaterial because the statement provides that Tylenol "has evolved to include a full suite of pain relief, cold and flu, sleep and pediatric products," and the Amended Complaint properly alleges that the "full suite" of Kenvue products includes Tylenol products including PE. (*Id.* ¶¶ 3, 84.)

Regarding the statements in the Exchange Offer Registration and Prospectus pertaining to the monograph system, the Court again finds that those statements are not plausibly alleged as misleading. (*Id.* 140.) Lastly, with respect to the failure to adequately disclose all the risk factors in the Exchange Offer Registration Statements in violation of Item 105, having found that the Exchange Offer Statement and Prospectus omits material information, the Court need not address whether Item 105 has been violated.

In sum, the Court finds that the statements contained in Paragraphs 136 and 138 are plausibly alleged to be misleading. The statements in Paragraph 140 are not plausibly alleged to be misleading. Accordingly, Plaintiffs have stated a claim under Section 11 with respect to the Exchange Offer statements.

2. Section 12 Claims

As explained, in addition to Section 11, Plaintiffs bring claims under Section 12(a)(2). Section 12(a)(2) establishes civil liability for any person who "offers or sells" a security "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). A plaintiff must adequately allege a defendant is a "seller." *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 716 (3d Cir. 1996). Under Section 12(a)(2), a seller "may be one who passes title to the buyer for value (a direct seller) or one 'who successfully solicits the purchase, motivated at least in part by a desire

to serve his own financial interests or those of the securities owner' (a solicitor seller)." *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 643 (1988)).

The Court finds that Plaintiffs have sufficiently alleged Section 12(a)(2) violations. The Amended Complaint alleges that Defendants were either direct sellers or solicitor sellers. For example, Paragraph 155 of the Amended Complaint alleges that Kenvue is an issuer of shares of common stock through the IPO Registration Statement. (Am. Compl. ¶ 155.) Paragraph 156 alleges that the Individual Defendants "each signed the IPO Registration Statement." (*Id.* ¶ 156.) Paragraph 157 moreover discusses the role of the Underwriter Defendants and states that they had a duty to ensure that the statements in the registration statements were true and correct. (*Id.* ¶ 157.) Paragraph 158 alleges that all Defendants were responsible for the contents and dissemination of the IPO Registration Statement. (*Id.* ¶ 158.) Paragraph 165 explains that "by means of the defective IPO Prospectus," Defendants "promoted, solicited, and sold [Kenvue's] common stock to Plaintiffs." (*Id.* ¶ 165.) They did so by "preparing, disseminating, and presenting to potential investors and otherwise eliciting investor participation." (*Id.*)

In light of these allegations and several others, Plaintiffs have met their burden under Section 12(a)(2) against all Defendants. (*See also id.* ¶¶ 178, 183, 184, 185, 187, 193, 194.) These allegations plausibly allege that Plaintiffs purchased securities pursuant to a materially false or misleading statement, prospectus, or oral communication. *See* 15 U.S.C. § 77l(a)(2). Having found that Plaintiffs plausibly alleged that Defendants' Registration Statements and Prospectuses included untrue statements or omitted material facts, the Court is satisfied that Plaintiffs have stated a claim under Section 12(a)(2).

### C.    Section 15 Claims

Lastly, Plaintiffs allege violations of Section 15 of the Securities Act.  To state a claim under Section 15 of the Securities Act, "the plaintiff must allege (1) a primary violation of the federal securities laws by a controlled person or entity; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation."  *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (quoting *Dutton v. Harris Stratex Networks, Inc.*, 370 F.R.D. 171, 178 (D. Del. 2010)).

Defendants argue that Plaintiffs' Section 15 claims fail because they have not pled any predicate Section 11 or Section 12(a)(2) claims.  (Moving Br. at 39–40.)  Independently, Defendants argue that the Amended Complaint fails to plead, in a non-conclusory manner, the other elements to succeed on a Section 15 claim—that is, control and culpable participation.  (*Id.* at 40.)  In opposition, Plaintiffs insist that the Amended Complaint meets the elements to state a Section 15 claim because it alleges that J&J owned almost ninety percent of Kenvue until the Exchange Offer and Kenvue admitted that J&J would continue to control the direction of its business after the IPO.  (Opp'n Br. at 45.)  Moreover, Plaintiffs contend that control is evident by J&J's appointment of Kenvue's CEO and CFO, that J&J had three executives sitting on Kenvue's board of directors, and that Kenvue filed a Registration Statement and Prospectus in conjunction with J&J's offer to exchange shares.  (*Id.*)

Here, Plaintiffs' Section 15 claims related to the IPO and Exchange Offer are only asserted against the Individual Defendants and J&J.  The Court has already concluded that Plaintiffs have plausibly alleged that Defendants made material misstatements in their registration statements. Plaintiffs have therefore adequately pled a primary violation.  With respect to control, Plaintiffs allege that the Individual Defendants were controlling persons by virtue of their positions (*id.*

¶¶ 172, 200), and that the Individual Defendants and J&J were in positions of control and meaningfully culpable insofar as they controlled the false and allegedly misleading statements contained in the IPO and Exchange Offer Registration Statements and Prospectuses, (*id.* ¶¶ 173, 201–206).

Accordingly, the Court also finds that Plaintiffs have adequately alleged a violation of Section 15 of the Securities Act.

**V.      CONCLUSION**

For the reasons stated above, the Court will **DENY** the Motion.  An appropriate Order will follow.

Date: March 24, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**